UNITED STATES of America, Appellee,

v.

Fernando RODRIGUEZ PEREZ,
Defendant, Appellant.

No. 79–1665.

United States Court of Appeals,
First Circuit.

Argued May 5, 1980.

Decided July 17, 1980.

A. J. Amadeo Murga, Hato Rey, P.R., for defendant, appellant.

Jose A. Quiles, Asst. U. S. Atty., San Juan, P.R., with whom Raymond L. Acosta, U. S. Atty., San Juan, P.R., was on brief for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Defendant Fernando Rodriguez Perez appeals his conviction on one count of possession of counterfeit currency in violation of 18 U.S.C. § 472, arguing that the district court erred in refusing to suppress the 21 counterfeit $100 bills found in his briefcase during a search of his hotel room. In denying defendant's motion to suppress, the district court found that defendant voluntarily consented to the search. We affirm.

## I.

Defendant was indicted on September 19, 1979 for possession of counterfeit currency with intent to defraud. On September 28, he filed a motion to suppress the currency and any oral statements made by him at the time of his arrest. An evidentiary hearing was held on this motion by the magistrate who recommended that it be denied. When the case was called for trial on November 1, 1979, defendant renewed his objections to the magistrate's recommendation. He also waived a jury trial, and stipulated that the notes were in fact counterfeit. The district court thereupon proceeded to take further evidence on the validity both of the search and subsequent arrest. Two Secret Service agents testified for the government; defendant testified on his own behalf.

Special Agents Anibal Perez and Marino Radillo testified, in substance, as follows. At approximately 8 a. m. on September 9, 1979, the FBI received an anonymous phone call reporting that the defendant and one Jorge Garcia Patini were attempting to sell or pass $100 counterfeit notes. The two men were reported to be staying at the Hotel Bolivar in Santurce, Puerto Rico. This information was relayed to the office of the Secret Service, which dispatched six agents to investigate. At the hotel, Agent Radillo approached the desk clerk and pretended to be "Miguel", a friend of defendant. Radillo asked the clerk to summon defendant to meet him in the lobby. Radillo then departed for an adjacent cafeteria, where the other agents were waiting. A few moments later, defendant was observed approaching the lobby from a corridor. Agents Anibal Perez and his superior, Joseph Perez, encountered defendant as he emerged into the lobby and announced that they were Secret Service agents. The agents were dressed in slacks and sports shirts, and were not carrying weapons except for Agent Anibal Perez who said he had a gun in an ankle holster. When defendant, who had taken a chair, asked what was going on, Agent Anibal Perez told him there had been a complaint against him. The agent then inquired whether it would be possible to talk in defendant's room. Defendant agreed. The three then proceeded to defendant's room, with defendant leading the way and the two agents following.

Defendant opened the door to his room. Once inside, Agent Joseph Perez closed the door, presented his identification to defendant, and asked defendant to sit on the bed. He then asked defendant if it would be all right for the agents to search his room.

Defendant replied, "Go ahead, I have nothing to hide."[1] While defendant sat on the bed and Agent Joseph Perez stood near the door, Agent Anibal Perez proceeded to search the small 7' by 10' room, beginning with a briefcase that was sitting on top of a bureau. At this point, Agent Radillo entered the room. Inside the briefcase, Agent Anibal Perez found some papers and a bank envelope containing 21 counterfeit $100 bills sandwiched between four genuine $1 notes. When Perez announced, "Here is the counterfeit," Agent Radillo proceeded to place defendant under arrest, giving him the appropriate warnings as to his constitutional rights. After acknowledging his rights, defendant explained that he had won the money in a cockfight in Miami and that he had come to Puerto Rico in order to pass the notes. Defendant denied knowing anyone named Jorge Garcia Patini.

Defendant testified to a somewhat different version of events. He said he arrived in Puerto Rico on September 8, 1979 on a business and pleasure trip, and that he proceeded to the Hotel Bolivar in Santurce. At about 9 a. m. on September 9, he said, he was informed by a janitor that "Miguel from Miami" was in the lobby and wished to see him. He dressed and went to the lobby, but as he reached the glass door at the end of the corridor, he was met by Special Agent Anibal Perez. Perez identified himself as a Secret Service agent and asked defendant if he was Fernando Rodriguez. When defendant confirmed that he was, Agent Perez told him, "Let's go back to your room, I want to ask you some questions." Defendant said he noticed that the agent was wearing a gun under his shirt. Defendant led the agent to his room, opened the door, and was told to sit on the bed. The agent began searching the room without permission, including the bureau drawers. After asking if the briefcase belonged to defendant, Agent Perez opened it and, upon finding the counterfeit bills, said, "Oh, this is what I am looking for." According to defendant, the agent then went to the hall and signalled for Agent Radillo, who entered the room and began questioning defendant without warning him as to his rights. Defendant claimed he was promised that if he cooperated, the matter would end right there, whereupon he disclosed that he had won the bills as a prize at a cockfight. Defendant testified generally that he complied with all the agents' requests because he was a law-abiding citizen and because he did not know he had the right to refuse to comply.

On cross-examination, defendant revealed that he was 32 years old, a Cuban native, a resident of the United States for 15 years, and a high school graduate. He stated that he had completed two years of junior college in Miami in computer electronics. Defendant further stated that he was in the business of exporting toys and crystal items, that he traveled to Puerto Rico often for business and for the cockfights, and that he had stayed at the Hotel Bolivar six or seven times before. On the date of his arrest, he said, he was not under the influence of drugs or medicine and he had had a good night's sleep. Under questioning from the court, defendant claimed that he had brought the counterfeit money to Puerto Rico in order to find the person from whom he had received it.

In its findings of fact and conclusions of law, the district court indicated that it accepted the testimony of the government's witnesses as to controverted events. The court found that defendant's testimony was not credible. Based on the facts and circumstances as found, the court held that defendant's consent to the search of his room was voluntary, and further found that defendant was not placed in custody until after the search, at which time he was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## II.

Warrantless searches are *"per se* unreasonable . . . subject only to a

---

1. All of these conversations originally occurred in Spanish. Defendant's precise words, according to Agent Perez, were, "Rebusca donde quieras, pues no tengo nada que ocultar."

few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One of the specifically established exceptions is for searches conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Defendant's principal contention on appeal is that the district court erred in concluding that defendant consented to the search of his hotel room. While the burden of proving voluntariness is on the government, *id.* at 222, 93 S.Ct. at 2045, the question of whether the consent given in a particular case was voluntary "is a question of fact to be determined from all the circumstances." *Id.* at 248–49, 93 S.Ct. at 2058–2059. We have consistently held that the findings of the district court on this issue will not be overturned unless "clearly erroneous." *See, e. g., United States v. Miller*, 589 F.2d 1117, 1130 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Cepulonis*, 530 F.2d 238, 243 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976). Here the district court, as it was entitled to do, rejected the defendant's version of events and accepted that of the government's witnesses. The only question, therefore, is whether the government's credited evidence was sufficient to support a finding of voluntariness.

■ Defendant argues that in this case the government's burden to show voluntariness was especially heavy as defendant was allegedly "in custody" at the time he is supposed to have consented to the search. Defendant observes that the Supreme Court in *Schneckloth* reserved the question of what standard would apply in assessing the validity of consent given in a custodial setting. 412 U.S. at 240 n.29, 93 S.Ct. at 2055 n.29. More recently, however, in *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Court reversed a finding of involuntariness where the defendant was under arrest at the time of his supposed consent.

"There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."

*Id.* at 424, 96 S.Ct. at 828. Similarly, in the present case there was no use or threat of force, no promises or coercion, and defendant was not confined in a police station. It is true that the defendant in *Watson* was not in a small hotel room when he gave his consent, and that he was warned before consenting that anything found in the search could be used as evidence against him, *id.* at 425, 96 S.Ct. at 828. Unlike *Watson*, however, the present defendant was not actually arrested until *after* he gave consent. Even were we to regard him as "in custody" at the time of his consent, it would be "custody" only in the most attenuated sense of the word. Under *Watson*, this would be but one of the factors to be considered in determining from the totality of the circumstances whether defendant's consent was voluntary. No special rule would apply. *Cf. United States v. Cepulonis*, 530 F.2d 238 (1st Cir. 1976) (defendant's consent voluntary despite arrest).

■ Defendant contends that the voluntariness of his consent was undermined by the government's use of a "trick" to lure him into the lobby. We note, first of all, that this "trick"—the impersonation of one of defendant's friends by an agent—involved no apparent illegality or misconduct. Impersonations are an accepted part of undercover police work. This was not a case where, for example, an illegal arrest led to the uncovering of further, tainted evidence. *Compare Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–416, 9 L.Ed.2d 441 (1963). Nor can we disagree with the district court's conclusion that this strategem did not affect the voluntariness of defendant's later choices. Once in the

lobby, defendant was placed under no compulsion to lead the agents back to his room. He could have insisted that any conversation take place in the lobby where he had seated himself; the record contains no indication that the agents would not have acquiesced.

Finally, defendant argues the present case is more nearly analogous to *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), than to *Schneckloth*. In *Johnson*, Seattle police and federal agents received a tip that unknown persons were smoking opium at a local hotel. The officers followed the aroma of opium to a room where they knocked on the door. When defendant answered and opened the door, the officers came into the room uninvited. Defendant was placed under arrest and a search of the premises made which turned up a quantity of opium and other incriminating evidence. The Supreme Court suppressed the evidence on grounds that the officers had not obtained a warrant to enter the hotel room, and that defendant's silent acquiescence to entry "demanded under color of office" did not justify the intrusion. 333 U.S. at 16–17, 68 S.Ct. at 370.

We find *Johnson* readily distinguishable. Here the officers made no demand "under color of office" that they be admitted to defendant's hotel room. They simply asked if they could continue their conversation in the room rather than in the lobby of the hotel. Defendant did more than silently acquiesce to a police intrusion; he actually led the way back to his room and opened the door for the officers. Once inside, he verbally consented to a search, asserting that he had "nothing to hide." The fact that the officers subsequently found counterfeit money should not undermine the voluntariness of defendant's consent where he had some reason to hope that the agents would not detect the money concealed in the bank envelope between genuine $1 bills.

The present defendant was a well-educated businessman, fluent in Spanish, familiar with the hotel in which he was staying and plainly able to appreciate the consequences of his actions. At no time was he threatened or pressured to give his consent. No guns were shown. Defendant's manifestations of consent included not only his words, ("Go ahead, I have nothing to hide"), but also such actions as leading the way to his hotel room and opening the door for the agents. As we are not "left with the definite and firm conviction that a mistake has been committed," *United States v. Cepulonis*, 530 F.2d 238, 244 (1st Cir. 1976), we uphold the district court's finding of voluntary consent.

### III.

What we have said above also serves to dispose of defendant's alternative argument. Defendant contends that, even assuming he consented to the search, the counterfeit currency should have been suppressed as the fruit of an illegal arrest. His argument is that the Secret Service agents "detained" him in the lobby, within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that this detention, because not justified by probable cause or reasonable suspicion, was illegal. The question whether an encounter in which police officers merely approach a person and begin asking questions is a "seizure" for fourth amendment purposes was raised, but not answered, by the Supreme Court in *United States v. Mendenhall*, —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 479 (1980). Two of the Justices were prepared to hold "that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at ——, 100 S.Ct. at 1877 (Stewart, J., writing for himself and Justice Rehnquist). The three remaining members of the majority, while expressing no disagreement with this rule, *see id.* at ——, n.1, 100 S.Ct. at 1880 n.1, concluded that the question need not be addressed since it had not been raised below. *Id.* at ——, 100 S.Ct. at 1880 (Powell, J., concurring). The four dissenters also did not reach this question, although they concluded that defendant Mendenhall had been

"seized" when, following an initial confrontation with federal agents in an airline terminal, she was asked to accompany them to a Drug Enforcement Agency office in the same building. *Id.* at ——, 100 S.Ct. at 1887.

 While we are inclined to believe that the encounter in the present case between defendant and the Secret Service agents in the lobby of the hotel was not a "seizure" subject to the limitations of the fourth amendment, we need not decide that question here. Even if this encounter is regarded as an "investigatory stop", such stops are permissible if justified by reasonable suspicion of criminal activity. *See, e. g., United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). In the present case, the officers had received information from the FBI that the defendant was at the Hotel Bolivar and that he was attempting to pass counterfeit money. While the source of this information—an anonymous phone call—was not sufficient to establish probable cause for defendant's arrest, this information was certainly sufficient to justify further investigation. *See Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1922–1923, 32 L.Ed.2d 612 (1972). The most natural and logical next step was for the officers to go to the hotel and seek out defendant to see what he had to say. The district court explicitly found, considering all the facts and circumstances, that when the agents approached defendant he freely consented to take them to his hotel room. This finding was not clearly erroneous.

As defendant has not demonstrated any error in the findings of the district court, we hold that the evidence seized in his hotel room was properly admitted against him. Defendant does not argue, nor could he, that this evidence was insufficient to support the district court's findings of guilt.

*Affirmed.*