UNITED STATES of America

v.

Robert T. KIMBALL and David M. Emery, Defendants.

Crim. No. 82–00020–B.

United States District Court, D. Maine.

Feb. 7, 1983.

William H. Browder, Jr., Asst. U.S. Atty., Bangor, Me., for plaintiff.

Robert Levine, Rockland, Me., Paul Gibbons, Camden, Me., for defendants.

## MEMORANDUM DECISION *

CYR, District Judge.

The defendants seek to suppress certain evidence [1] obtained in connection with their arrests for alleged violations of various laws relating to firearms.[2]

### FACTS

At approximately 9:15 p.m. on February 20, 1982, Sgt. Perley Sprague, a marine patrol officer of the Maine Bureau of Marine Resources, received a report that shots were being fired in the vicinity of Lasell Island, located about six miles east of Camden in Penobscot Bay. Sprague promptly proceeded to a point on the mainland nearer Lasell Island from where he could hear the sound of automatic weapon fire from the direction of Lasell Island.

Sprague dispatched Marine Patrol Officers John Fetterman and Jeffrey Gallagher to Rockland where they boarded a U.S. Coast Guard patrol boat which took them to a position 4,000 yards off Lasell Island, where Fetterman observed sporadic automatic weapon fire, as evidenced by "tracer" rounds, coming from the island.

At about 10:35 p.m., the patrol boat approached to within 400 yards of the island, from where Fetterman could see lights in-

---

\* This memorandum contains findings of fact and conclusions of law as contemplated by Fed.R. Crim.P. 12(e).

1. The defendants seek to suppress physical evidence, consisting of a machine gun and a revolver, as well as all incriminating statements made at or about the time of their arrests.

2. Under the four-count indictment both defendants are charged with possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). Kimball is also charged with (1) possession of a firearm by a felon, 18 U.S.C. App. § 1202(a)(1); (2) receipt of a firearm by a felon, 18 U.S.C. § 922(h); and (3) the making of a false statement in connection with the purchase of a firearm, 18 U.S.C. § 922(a).

side a cabin on the island. At this distance tracer rounds were seen coming directly at the patrol boat from the direction of the cabin. The patrol boat backed off to a distance of 700 yards and activated its blue light and its running lights. Tracer rounds were again seen coming from the direction of the cabin and Fetterman heard what sounded like bullets striking the water beside the patrol boat. The patrol boat continued to back off, first to 1,500 yards, then to 2,000 yards. Each time the lights of the patrol boat were activated Fetterman observed renewed bursts of gunfire coming directly at the boat from the cabin.

The patrol boat kept the island under constant surveillance until 2:00 a.m. the next morning, when the Coast Guard Cutter Snohomish arrived and established radar surveillance. No other vessel was detected approaching or departing the island.

Upon their return to Rockland aboard the patrol boat at approximately 4:00 a.m. on February 21, 1982, Fetterman and Gallagher met with Knox County Sheriff Massie, Sgt. Sprague, Marine Patrol Lieutenant Carroll, Marine Patrol Officer Peva, and Ralph Knowlton, a deputy sheriff and Town of Camden police officer. The officers discussed and formulated a general plan for approaching the cabin, which they correctly believed to be the property of the defendant Robert Kimball. Although they spoke with a state prosecutor by telephone, the officers made no request that either arrest or search warrants be obtained.

At about 6:00 a.m. the seven officers and an emergency medical technician boarded a Coast Guard search and rescue boat ["44-footer"] and proceeded to Lasell Island.

Lasell Island is about one mile long and one-half mile wide, with a small cove on its western side. Even at low tide the island can be reached only by boat. Kimball's cabin is situated near the cove, on land leased from the owner of the island, who also owns the only other dwelling on the island, a summer home. The summer home, which is about one-quarter mile from Kimball's cabin, was unoccupied at the time of this incident.

The temperature on the island that morning was 28°F and although there was a 20-knot wind the cove and the area near the cabin are somewhat sheltered. About two inches of snow had recently fallen on the island and there were occasional flurries that morning.

At about 7:30 a.m. the 44-footer entered the cove on the western side of the island. Officer Knowlton used a bullhorn to call Kimball out of the cabin, but there was no response. At 8:00 a.m. the 44-footer was tied up at the dock, which is pretty much directly in front of the main (front) entrance to the cabin. The only other boat at the dock was a lobster boat belonging to Kimball. Five officers got off the 44-footer and approached the cabin. Fetterman and Massie were armed with M–1 rifles; Knowlton with a 12-gauge shotgun; Peva with a semi-automatic M–16; and Sprague with a holstered side arm. The officers fanned out and approached the cabin cautiously with their shoulder weapons at the ready, finally positioning themselves facing the cabin in a semi-circle extending from either corner of the front side of the cabin.

Officer Knowlton, who was acquainted with Kimball, as was Sprague, identified himself and called for "Bobby" (Kimball) to come out of the cabin. Following the third request Kimball responded: "Wait'll I get my pants on." Kimball soon emerged through the front door, which is at the center of the front side of the cabin, and started down the steps. He was dressed in pants and a long-sleeved shirt, with only heavy, boot socks on his feet.

As many as four officers may have been visible to Kimball as he exited the cabin, including Sprague and Knowlton positioned at the front corner of the cabin to Kimball's right, Massie at the front corner to Kimball's left and Fetterman who was farthest from and more directly ahead of Kimball. Peva was beyond view, on a high knoll toward the rear of the cabin.

With his sidearm still in its holster, Sprague approached Kimball, while the other officers remained at their positions, fire-

arms ready. As he approached Kimball, Sprague noticed numerous spent shells on the cabin steps. Kimball was placed under arrest, handcuffed, and immediately advised by Sprague of his *Miranda* rights.[3] Sprague explained that the officers were there to investigate reports of gunfire in the area the previous evening. When asked if he was surprised, Kimball responded that he had "expected someone." But when asked if he knew anything about gunfire or about an automatic weapon, Kimball said he did not.

Upon being alerted to the presence of someone else inside the cabin, Sprague asked Kimball who else was inside. Kimball said that his girlfriend, Joni Dyer, was inside. Kimball was directed to tell Dyer to come out. When Dyer appeared at the front door, Sprague suggested that Kimball might want to ask her to bring out his boots. At Kimball's request, Dyer brought the boots, which the handcuffed Kimball put on, with Sprague's assistance. Dyer was allowed to go back inside the cabin. Sprague later adjusted Kimball's handcuffs to permit Kimball to urinate.

Sprague told Kimball that the officers wanted the automatic weapon and asked if Kimball would permit them to go inside the cabin to look for it. Kimball said he would rather not allow the officers inside. Sprague then informed Kimball that he had an "absolute right" to refuse entry, but that, if he did so, the other officers would be left on the island to secure the premises while Sprague returned to Rockland for a search warrant. Whereupon, Kimball agreed to allow the officers to look inside the cabin for the gun.

Although estimates of the length of time Kimball remained outside the cabin vary considerably, from about 5 minutes, according to Sprague, to between 15 and 20 minutes, according to Kimball, Officer Fetterman actually recorded a 17-minute interval, which the Court accepts as the more credi-

ble evidence of the maximum length of time Kimball remained outside. Kimball testified that he did not really feel very cold standing outside the cabin. In light of the limited discussion (and some "small talk") between Sprague and Kimball, and of the fact that Kimball did not feel very cold, though it was 28°F with some considerable wind, it seems most probable that Kimball remained outside more than five minutes, but less than 17 minutes.

Kimball entered the cabin first, followed by Sprague and Fetterman. Upon entering the cabin, Sprague was surprised to see the defendant Emery, who was also known to Sprague. Sprague immediately proceeded to advise Emery and Dyer, jointly, of their "*Miranda*" rights. When asked whether he understood his rights, Emery, who is 33 years old and a high school graduate, stated that he was well aware of his rights. Kimball told Emery that the officers were looking for the automatic weapon. Sprague said that it would be much "easier" if they showed him where the weapon was. Kimball nodded affirmatively to Emery. With Sprague following in close proximity, Emery went over to a sofa in the main room of the 24′ × 30′ cabin, reached behind the sofa, retrieved a Colt M–16 machine gun from under a blanket, and surrendered it to Sprague.

Kimball's handcuffs were then removed and Emery offered Sprague a cup of coffee, which he accepted. After some casual conversation with Kimball and Emery, Sprague again asked Kimball about the gunfire the night before. Kimball responded that he had fired several hundred rounds with the automatic weapon. Emery stated that he also had "ripped off a few" rounds. When asked how hard it was to obtain such a weapon, Emery said that if he had the money he could buy one in Boston. Both defendants emphatically denied any knowledge of the presence of a Coast Guard patrol boat the previous night. They also stated that Joni Dyer had not fired the weapon.

---

**3.** The other three officers, who had been directing their weapons toward Kimball as he descended the cabin steps, pointed them away as Sprague approached Kimball, and they began moving about. One officer began picking up spent shells and another returned to the 44-footer to warm his hands. Fetterman went around to the rear of the cabin.

Sprague advised Kimball and Emery that they were under arrest for criminal threatening with a dangerous weapon, but that Dyer would not be arrested.

While preparations were underway to take the defendants to Rockland on the 44-footer, Kimball expressed concern about leaving his lobster boat unattended on the island and asked if Emery could be permitted to take the boat to Rockland. Sprague agreed, provided Emery was accompanied by two officers.

Prior to allowing Emery to board the lobster boat, Officer Gallagher made a cursory search inside the pilothouse of the boat, where he saw a holstered pistol hanging in open view two or three steps from where Gallagher stood on the first stair leading belowdecks. Gallagher seized the pistol, a .22 caliber revolver, explaining to Kimball that it would be held while Emery drove the lobster boat to Rockland and while both defendants were being processed.

Kimball was taken to Rockland aboard the 44-footer. Emery drove the lobster boat to Rockland.

## DISCUSSION

I. *Motion to Suppress Physical Evidence*

A. *Fruit of the Poisonous Tree*

■ The defendants first argue that the Colt M–16 machine gun and the Sturm Ruger revolver are the suppressible fruits of the warrantless arrest of Kimball without probable cause.[4] *See, e.g., United States v. Pimental,* 645 F.2d 85 (1st Cir. 1981). There is probable cause to arrest

"where there are facts and circumstances within an officer's knowledge that would be sufficient to warrant a prudent person, or one of reasonable caution, in believing that the person to be arrested has committed, is committing, or is about to commit an offense." *United States v. McQueeney,* 674 F.2d 109, 114 (1st Cir.1982). *See also Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). "Probable cause for arrest does not require the quantum of proof necessary to convict." *United States v. Miller,* 589 F.2d 1117, 1128 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

■ Kimball argues that there was no probable cause to believe that the automatic weapon was unregistered or that Kimball was a felon prohibited from possessing a firearm.

Kimball was not arrested on federal firearms charges alone. Sprague testified that Kimball and Emery were arrested for criminal threatening with a dangerous weapon and for possession of an automatic weapon, both criminal offenses under Maine law, *see* 17–A M.R.S.A. §§ 209 & 1051.

It cannot be seriously questioned that Sprague had probable cause to arrest Kimball for criminal threatening with a dangerous weapon, a Class C felony under Maine law. *See* 17–A M.R.S.A. §§ 209, 1252(2) & (4). Through personal observation and from his communications with fellow officers, Sprague: (1) was reliably informed that tracer bullets were repeatedly seen and heard coming at the Coast Guard patrol

---

4. Although the motion to suppress alleges that the "Defendant(s) were arrested without a warrant and without probable cause," the defendants' memoranda focus solely on the warrantless arrest of Kimball.

Essentially, their argument is that, regardless of the "voluntariness" of Kimball's consent to enter and search the cabin, a consent obtained from a person *illegally* arrested poses the further question of "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged

of the primary taint," *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *See United States v. Sanchez-Jaramillo,* 637 F.2d 1094, 1099–1100 (7th Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980); *United States v. Perez-Esparza,* 609 F.2d 1284, 1288–91 (9th Cir.1980). Because the Court considers Kimball's warrantless arrest to have been lawful, there is no need to consider whether his consent to the search of the cabin was sufficiently voluntary *to purge the primary taint of an unlawful arrest. Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

boat on the previous night from the direction of Kimball's cabin; (2) reasonably believed that the bullets were being fired from an automatic weapon, such as he had become familiar with as a serviceman in Vietnam; (3) knew that constant surveillance of the island had revealed no arrivals or departures since the gunfire, except by law enforcement vessels; (4) personally observed numerous spent shell casings on the cabin steps as he first approached Kimball in front of the cabin; (5) knew Kimball on sight and as the owner of the cabin; and (6) had no basis to suspect the presence of any other person on this isolated island in the midst of winter.

Sprague testified that the defendants were arrested, among other reasons, for criminal threatening with a dangerous weapon. Under Maine law "[a] person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury." 17–A M.R.S.A. § 209. Criminal threatening is a Class D crime, unless "committed with the use of a dangerous weapon," in which case it is a Class C crime punishable by imprisonment for up to five years. 17–A M.R.S.A. § 1252(2) & (4). A firearm is a "dangerous weapon." *See* 17–A M.R.S.A. § 2(9).

On the basis of the information available to him, Sprague had probable cause to believe that the occupant or occupants of the Kimball cabin had intentionally or knowingly fired an automatic weapon in the direction of the manned vessel (Coast Guard patrol boat) for the purpose of placing persons on the boat in fear of imminent bodily

injury and that the officers had in fact feared imminent bodily injury.[5]

Kimball seems to suggest that because the officers did not actually see who was firing the weapon the night before they could not reasonably believe that he, in particular, had committed any crime. At the time of Kimball's arrest Sprague had no reason to believe that anyone else might be at the isolated cabin which was Kimball's home. And on the basis of the continuous surveillance of the island, there was ample reason to believe that Kimball had remained at the cabin throughout the preceding night. Kimball was not arrested merely because he was found in the presence of others reasonably believed to have committed a crime. *Compare United States v. DiRe*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), *and United States v. Barber*, 557 F.2d 628, 630–32 (8th Cir.1977), *with United States v. Luschen*, 614 F.2d 1164, 1171 (8th Cir.), *cert. denied*, 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980). At the time of his arrest, Kimball was apparently the only person present at the cabin, except for the law enforcement officers. Observing no one other than Kimball, Sprague simply and reasonably concluded that Kimball was probably the person responsible for the shooting the night before, since surveillance had excluded any reasonable prospect that any other person, except the law enforcement landing party, had left or arrived at the otherwise deserted island during the interval between the shooting and Kimball's arrest.

The warrantless arrest of Kimball was lawful, *see* 17–A M.R.S.A. § 15(1)(A)(2),[6]

---

**5.** Fetterman observed that with each eruption of gunfire the light emanating from the cabin would appear to change, as if the door were being opened. Each activation of the vessel's running lights and blue light was followed by another burst of tracer fire from the cabin directly toward the vessel. Thus, with good reason, the officers believed someone was firing *at them,* and they reacted accordingly, by backing their vessel further and further away until they were out of range, where they remained until their landing the next morning after daylight.

**6.** Kimball suggests that the failure of state officers to comply with the warrant requirements

of 17–A M.R.S.A. § 15 mandates the suppression, in these federal proceedings, of evidence obtained as the fruit of his unlawful arrest. The Court need not address this unsettled question, *compare Elkins v. United States,* 364 U.S. 206, 223–24, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), *with United States v. DiRe,* 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948); *see United States v. Hall,* 543 F.2d 1229, 1234–35 (9th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *United States v. Miller,* 452 F.2d 731 (10th Cir.1971); *see generally* 1 W. LaFave, *Search & Seizure* § 1.3(c) (1978), in light of its ruling

since the officers had probable cause to believe that Kimball had committed a Class C offense under Maine law.

### B. Search of the Cabin [7]

The warrantless searches leading to the seizures of the machine gun and the revolver were violative of defendants' fourth amendment rights, unless within some "well-delineated" exception to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

#### 1. Exigent Circumstances.

■ The Government argues that a warrantless search of the cabin was permissible by reason of the exigent need to ensure the safety of the officers. *See, e.g., United States v. Irizarry,* 673 F.2d 554, 557–58 (1st Cir.1982). Exigent circumstances "have traditionally been found in those crisis situations when there is a compelling need for official action *and no time to secure a warrant.*" *Id.* at 557 (*emphasis added*).

The uncontradicted evidence establishes that, by no later than 11:30 p.m. on February 20, 1982, law enforcement officials at Rockland had been informed by radio by marine patrol officers aboard the Coast Guard patrol boat of sufficient facts to support a reasonable belief that someone in Kimball's cabin was firing an automatic weapon toward the patrol boat. Nevertheless, between that time and 6:00 a.m. on February 21, 1982, when Fetterman, Gallagher and other officers boarded the 44-footer for Lasell Island, no effort was made to obtain a search warrant. The failure of law enforcement personnel to avail themselves of this clear opportunity to obtain a search warrant may be explained, but not excused (particularly since a prosecuting attorney was fully informed of the incident prior to the time the officers left Rockland for their landing on Lasell Island), by their preoccupation with the impending landing.

The fact that the officers believed that the automatic weapon was somewhere in the cabin "cannot, by itself, transform the situation into a crisis," *id.* at 559 n. *. The Court is satisfied that the officers were without significant concern for their safety once Kimball had been handcuffed and Dyer appeared at the front door. Although the officers strongly suspected that an automatic weapon remained inside the cabin, they permitted Dyer to go back inside the cabin and did not know or suspect that Emery or any other person was inside. The absence of a "compelling need," *see id.* at 557, to enter the cabin to search for the suspected automatic weapon is further evidenced by their stated intention to leave armed officers on the island to secure the cabin while Sprague returned to Rockland (some six miles by boat) for a search warrant. The Court holds that there was ample time to obtain a search warrant and that there existed no exigency justifying the entry without a warrant. *See United States v. Irizarry,* 673 F.2d at 557.

Finally, under First Circuit case law, even the existence of exigent circumstances would support no more than a protective entry and securing of the cabin, pending issuance of a search warrant, not an exploratory search for the suspected weapon. *See id.* at 559 n. *; *United States v. Edwards,* 602 F.2d 458, 468 (1st Cir.1979).

#### 2. Consent.

A search conducted pursuant to consent does not require a search warrant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Rodriguez Perez,* 625 F.2d 1021, 1024 (1st Cir.1980).

"The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." *United States v. Mil-*

---

that the warrantless arrest was predicated on probable cause.

**7.** The Court assumes, though not without some question, that the automatic weapon was

obtained as the result of a "search" which began with Sprague's warrantless entry into the cabin and continued until Emery produced the weapon from behind the sofa.

ler, 589 F.2d 1117, 1130 (1st Cir.1978), cert. denied, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). The Government bears the burden of proving "that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

There is no dispute that the search was conducted with "consent-in-fact," United States v. Miller, 589 F.2d at 1130. Kimball expressly authorized the officers to enter the cabin, in response to Sprague's request that they be permitted to search for the automatic weapon; and, accompanying the officers inside, Kimball advised Emery that the officers wanted the weapon and nodded to Emery to produce the weapon, after Sprague said it would be "easier" if they did so.

It is the voluntariness of the consent that is at issue.

The United States Supreme Court has explained that

the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.... In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police.questions, as well as the possibly vulnerable subjective state of the person who consents.

Schneckloth v. Bustamonte, 412 U.S. 218, 227, 229, 93 S.Ct. 2041, 2047, 2048, 36 L.Ed.2d 854 (1973).

There are several considerations which militate against a voluntary consent in these circumstances.

In the first place, the defendants testified to a somewhat different version of events than the officers. Nevertheless, the Court is satisfied that there is no material respect in which the testimony of the defendants was either as credible, see United States v. DiGregorio, 605 F.2d 1184, 1188 (1st Cir.) [on issue of consent, credibility is for trial court as finder of fact], cert. denied, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979), or as internally consistent as that of the officers.

Secondly, the defendants point to the fact that Kimball was in custody[8] when he voiced his consent. "[A]rrest carries its own aura of coercion [and] the burden upon the government to show voluntary consent is 'particularly heavy.'" Gorman v. United States, 380 F.2d 158, 163 (1st Cir.1967). Yet custody alone has never been considered enough to demonstrate coercion. United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). See, e.g., United States v. Cepulonis, 530 F.2d 238 (1st Cir.1976). Instead, custody is one significant factor to be weighed in determining voluntariness. See United States v. Rodriguez Perez, 625 F.2d at 1024.

Of particular importance is the "atmosphere" surrounding the arrest and ensuing detention. See United States v. Miller, 589 F.2d at 1132. Kimball was awakened by Lt. Knowlton at about 8:00 a.m. and summoned outside the cabin where four officers may have been visible to Kimball; three with shouldered weapons pointing at Kimball as he emerged. As Sprague approached Kimball carrying only a holstered pistol, the other officers directed their weapons away from Kimball, and once he was handcuffed the officers began moving about; one or two walking toward Sprague and Kimball; others walking around outside the cabin; one returning to the boat at the dock; and one picking up cartridge shells.

---

8. The Government argued in its prehearing brief that Kimball was not under arrest when he was handcuffed by Sprague in front of the cabin. But Sprague testified unequivocally, as the Government now appears to concede in its posthearing brief, that Kimball was under arrest at that time.

■ A display of weapons in the course of an arrest may constitute a significant indicator of a coerced consent. *United States v. Jones*, 641 F.2d 425 (6th Cir.1981); *United States v. Mapp*, 476 F.2d 67 (2d Cir.1973).[9]

■ At first Kimball expressed his preference that the officers not search the cabin for the automatic weapon, without a warrant. Several minutes later, after some further discussion, Kimball expressly authorized the officers to enter the cabin to look for the weapon. *See, e.g., United States v. Pulvano*, 629 F.2d 1151, 1157 (5th Cir.1980) [initial refusal is "factor to be considered," but not necessarily dispositive of voluntariness of later consent]. The intervening events are critical.

After Kimball stated his reluctance to have the officers enter without a warrant, Sprague expressly confirmed Kimball's "absolute right" to refuse entry. Sprague informed Kimball, however, that officers would be left on the island to "secure" the cabin while he went to Rockland for a search warrant.[10]

Sprague did not mislead Kimball in any way. Sprague certainly possessed the requisite probable cause for the issuance of a search warrant, and "given the exigencies of the situation," the officers would have been justified in securing the premises pending issuance of a warrant. *See United States v. DiGregorio*, 605 F.2d 1184, 1188 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). Moreover, any coerciveness inherent in the advice that officers would remain on the premises while Sprague returned to Rockland for a search warrant was but the legally inevitable, practical consequence of the actual circumstances, primarily the remoteness of the scene, in which the parties found themselves. It is more plausible that Kimball's permission to enter the cabin was prompted (1) by his realistic resignation to the inevitability of a search, once Sprague expressed his firm determination to return to Rockland for a search warrant; (2) by Kimball's concerns for his own comfort; or (3) by his appraisal of the prospect that cooperation with the officers might result in greater leniency toward himself and his companions. None of these motivations was improperly inspired by overbearing or misleading conduct on the part of the police. Indeed, any such motivations survived Sprague's explicit advice that Kimball had an "absolute right" to withhold his consent to a warrantless search.

Yet another circumstance bearing upon the voluntariness of Kimball's consent to enter the cabin concerns whether physical

---

**9.** In *Jones,* officers demanded entry after kicking and banging the door, claiming that they had a "warrant," which was in fact an *arrest* warrant for *another person.* Five officers, two with shotguns and others with pistols drawn, entered and searched the room with the occupant's "consent." The Ninth Circuit concluded that "[t]he overpowering police presence, the kicking and banging on the door, the assertion of lawful authority, all suggest that [the occupant] had no real choice other than to let the police search." 641 F.2d at 429.

In *Mapp,* armed officers broke into an apartment at 2:00 a.m. to arrest its lone female occupant. Without warning of any kind the police told her that they wanted a package. Whereupon, the "alarmed" suspect pointed to a closet where the package was found. The Second Circuit found that her "consent" was "mere acquiescence in and submission to lawful authority." 476 F.2d at 78.

**10.** The precise language used by Sprague is not clear. The Fifth Circuit has considered it significant whether an officer presenting such an alternative to consent states that he will "seek" a warrant or that he will "obtain" a warrant. *See United States v. White,* 617 F.2d 1131, 1134 (5th Cir.1980); *United States v. Boukater,* 409 F.2d 537, 538 (5th Cir.1969). However, courts have upheld findings of voluntary consent even when officers state that they would *obtain* a warrant, concluding that such a statement is merely one factor to be balanced in determining voluntariness, *see United States v. Vasquez,* 638 F.2d 507, 528–29 (2d Cir.1980), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981); *United States v. Dennis,* 625 F.2d 782, 793 (8th Cir.1980); *United States v. Faruolo,* 506 F.2d 490, 493–94 (2d Cir.1974); *United States v. Agosto,* 502 F.2d 612 (9th Cir.1974) (*per curiam*); at least where there has been no trickery or deceit such as by proclaiming their capacity to obtain a search warrant in the absence of probable cause for its issuance, *see United States v. Vasquez,* 638 F.2d at 529; *United States v. Faruolo,* 506 F.2d at 494–95.

discomfort, particularly the cold, constituted a subtle form of coercion.

Kimball testified that he was not really cold while he stood outside the cabin. He did not request any additional clothing, even though the actions of the officers in suggesting and arranging to obtain his boots should have demonstrated to him that any such request would likely have been accommodated.

Kimball's principal contention concerning the cold is that he feared that if he refused to consent to a search of the cabin he would be kept outside in the cold while Sprague made the three-hour round trip for a search warrant. Sprague never suggested or even intimated that Kimball would have to remain outside. Of course, Kimball may nonetheless have considered this a likely consequence of withholding his consent, since his refusal to permit the officers to enter the cabin to look for the automatic weapon made it highly improbable that he would be allowed to go inside the cabin without the police officers. And again, Sprague's decent concern, if not solicitude, for Kimball's physical comfort should have given Kimball reasonable confidence that the officers would permit Dyer to fetch whatever additional clothing Kimball needed to enable him to remain outside as long and as comfortably as the officers themselves.

Finally, Sprague and Kimball knew and addressed each other on a first-name basis throughout,[11] which renders it most implausible that Kimball truly believed that he would be required to wait outside, without adequate clothing, for Sprague's return from Rockland.

Kimball also claims that Sprague coerced him by threatening to arrest Kimball's girlfriend, Joni Dyer, unless Kimball consented to the search. *See, e.g., United States v. Bolin,* 514 F.2d 554 (7th Cir.1975). The Court flatly rejects this contention, however, on the basis of Sprague's categorical denial and on the basis of the strong impression the Court has from all of the undisputed evidence that once Kimball was handcuffed none of the officers, much less Sprague, conducted himself in any threatening or intimidating manner such as would be consistent with threatening the arrest of Dyer as a means of inducing Kimball to consent to the entry without a warrant.

Kimball was in custody and may well have been somewhat startled and even a bit shaken by the appearance of the armed officers at his cabin at 8:00 a.m.,[12] notwithstanding his statement to Sprague that he had been expecting someone. Yet Kimball was not so overwrought but what he refrained from even responding until after the third instruction from the police to come out of the cabin. Kimball possessed the presence of mind to speak calmly with Sprague, to deny any knowledge of the shooting spree, and to deny the officers the right to enter in response to Sprague's initial request. Kimball had known at least two of the officers, Knowlton and Sprague, for several years. Once Kimball was handcuffed the demeanor and attitude of the officers changed substantially. Their weapons were no longer directed at Kimball, and Kimball's girlfriend was allowed to reenter the cabin, even though the officers still believed that the automatic weapon was inside.

The fact that *Miranda* warnings were given to Kimball prior to his consent also supports a finding of voluntariness. *See United States v. Miller,* 589 F.2d 1117, 1132 (1st Cir.1978); *United States v. Stanley,* 597 F.2d 866, 869 (4th Cir.1979). Additionally, Kimball was specifically advised of his right to refuse consent, which is itself a strong indicator of voluntariness. *See United States v. Mendenhall,* 446 U.S. 544, 559, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980); *Gorman v. United States,* 380 F.2d 158, 164 (1st Cir.1967).

---

**11.** Kimball and Sprague addressed one another as "Perley" and "Bobby."

**12.** He further testified that he was suffering from a hangover as a result of drinking the previous night. However, there is no indication, nor does Kimball claim, that the hangover had a disabling effect on his ability to comprehend and reason.

Although Sprague expressed disbelief at Kimball's statement that he knew nothing about the weapon and told Kimball he believed the weapon was inside the cabin, "there was no use or threat of force, no promises or coercion," *see United States v. Rodriguez Perez,* 625 F.2d 1021, 1024 (1st Cir.1980). "[T]he pressure exerted on a criminal by the realization that the jig is up is far different from the deliberate or ignorant violation of personal right that renders apparent consent ineffective." *United States v. Ciovacco,* 518 F.2d 29, 31 (1st Cir.1975) *quoting, Gorman v. United States,* 380 F.2d 158, 165 (1st Cir.1967). It is entirely possible that Kimball "thought [he] was acting in [his] self-interest, by voluntarily cooperating with the officers in the hope of receiving more lenient treatment," *see United States v. Mendenhall,* 446 U.S. 544, 559 n. 7, 100 S.Ct. 1870, 1880 n. 7, 64 L.Ed.2d 497 (1980), particularly since he knew Sprague, who appeared to be in charge, on a first-name basis. The fact that Kimball may have believed that if he did not consent his cabin would be searched at some point anyway does not make his consent involuntary. *United States v. Dennis,* 625 F.2d 782, 793 (8th Cir.1980). Kimball's subsequent conduct in helping the officers locate the weapon corroborates, rather than undercuts, the voluntariness of the consent. *See, e.g., United States v. Miller,* 589 F.2d at 1131–32 (stressing, *inter alia,* that defendant himself unlocked the "incriminating bag").

Although Kimball was arrested at gunpoint and was physically restrained by handcuffs until the weapon was found, the conduct of the officers toward him and his girlfriend was guarded, but cordial and considerate. According to Kimball, one of the officers asked to go inside to warm his hands, but accepted Kimball's refusal. Sprague made it clear that Kimball's cabin would be searched only with his consent or pursuant to a warrant which Kimball knew they did not have at that time nor could they get for some time. "Bowing to events, even if one is not happy about them, is not the same thing as being coerced." *United States v. Miller,* 589 F.2d at 1132 n. 13, *quoting Robbins v. Mackenzie,* 364 F.2d 45, 50 (1st Cir.), *cert. denied,* 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966). It is also noteworthy that both defendants emphatically denied any knowledge of the patrol boat's presence in the area the night before, even after their production of the automatic weapon and their admissions that they had fired it.

Kimball's consent was voluntary.

## C. *Seizure of the Revolver*

■ Following their arrests, Kimball requested that Emery be allowed to drive the lobster boat to Rockland so that it would not be left unattended and he would have some means of returning to the island after his release. When Kimball was told that two officers would have to accompany Emery on the lobster boat, Kimball agreed. Officer Gallagher discovered and seized the Sturm Ruger revolver aboard the lobster boat.

Although Kimball did not consent to a search of the lobster boat, belowdecks or elsewhere, he did consent to having officers accompany Emery aboard the vessel. Courts recognize the self-protection rights of officers to conduct warrantless, protective searches of areas within the "immediate control," *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), of an arrestee, including personal vehicles to which an arrested defendant has requested temporary access, *see United States v. Isham,* 501 F.2d 989 (6th Cir.1974); *United States v. Marshall,* 499 F.2d 76 (5th Cir.1974) (*per curiam*), *cert. denied,* 419 U.S. 1112, 95 S.Ct. 788, 42 L.Ed.2d 809 (1975).

Before permitting Emery to come aboard the lobster boat, Officer Gallagher was careful to examine the area immediately around the pilothouse to which Emery would have ready access while operating the boat. Upon descending one step leading belowdecks from the pilothouse, there appeared, within easy reach and "plain view," *see Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564

(1971), a holstered revolver hanging on a nail not more than three to four feet in front of Gallagher.

It was both prudent and proper for Gallagher to conduct a cursory search of areas aboard the lobster boat to which Emery would have ready access during the course of the trip to Rockland, particularly when, as in this case, a defendant *requests* such access and access has been permitted for nonpretextual purposes. *See United States v. Mason*, 523 F.2d 1122, 1126 (D.C.Cir. 1975); *United States v. Isham*, 501 F.2d at 990; *United States v. Marshall*, 499 F.2d at 77. The law enforcement officers authorized Emery to drive the lobster boat pursuant to the specific request and purposes of the defendant Kimball.

Once lawfully positioned so that the revolver was in plain view, Gallagher was entitled to seize it for his own protection, as well as for the protection of the public from anyone who might take the gun from the boat while moored in Rockland awaiting Kimball's release on bail. *See Cady v. Dombrowski*, 413 U.S. 433, 448, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); *United States v. Cepulonis*, 530 F.2d 238, 243 (1st Cir.), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); *United States v. Kidwell*, 518 F.2d 857, 859 (6th Cir.1975); *United States v. Isham*, 501 F.2d at 989.

### II. *Motion to Suppress Statements*

Defendants seek to suppress all statements made by them on Lasell Island, as having been obtained through exploitation of the allegedly illegal arrests and searches, and as the result of violations of their fifth amendment rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[13]

### A. *Adequacy of Warnings*

■ *Miranda v. Arizona* held that prior to custodial interrogation an accused must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479, 86 S.Ct. at 1630. The Supreme Court has noted more recently that the precise language used in *Miranda* need not be recited to an accused, because "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981) (*per curiam*). *See also Rhode Island v. Innis*, 446 U.S. 291, 297, 100 S.Ct. 1682, 1687, 64 L.Ed.2d 297 (1980).

Sergeant Sprague orally informed both defendants of (1) the right to remain silent; (2) the fact that any statement would be used against them in court; (3) their right to the "advice of an attorney during questioning;" and (4) their right to have an attorney appointed if unable to afford one. Like *Prysock*, " 'this is not a case in which the defendant was not informed of his right to the presence of an attorney during questioning or in which the offer of an appointed attorney was associated with a future time in court.' " 453 U.S. at 361, 101 S.Ct. at 2810, *quoting United States v. Noa*, 443 F.2d 144, 146 (9th Cir.1971).

Although Emery points to no particular omission or error in the *Miranda* warning he was given, he suggests that Sprague did not adequately explain the right to have an attorney present during any questioning that occurred on the island. "A *Miranda* warning need not explicitly convey to the accused his right to appointed counsel 'here and now' ...." *United States v. Contreras*, 667 F.2d 976, 979 (11th Cir.1982). Sprague advised each defendant of his unqualified right to the presence and advice of an attorney during questioning, plainly meaning *any* questioning. The warnings were

---

**13.** Although defendants have not elaborated on their *Miranda* argument, they seem to contend that the warnings provided by Sgt. Sprague were inadequate and that the Government has not established that the defendants voluntarily, knowingly and intentionally waived their rights to remain silent and to have counsel present during questioning, *see id.* at 473–76, 86 S.Ct. at 1627–28.

sufficient to apprise each defendant of his "right to remain silent and his right to have counsel, retained or appointed, present during questioning," *Fare v. Michael C.,* 442 U.S. 707, 717, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979).

### B. *Waiver*

*Miranda* instructs that an accused may waive his privilege against self-incrimination and his right to counsel "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444, 86 S.Ct. at 1612. The *Miranda* opinion states that "[n]o effective waiver of the right to counsel during interrogation can be recognized unless *specifically* made after the warnings ... have been given." *Id.* at 470, 86 S.Ct. at 1626 (*emphasis added*). More recently the Supreme Court has explained, in a case where the accused had refused to sign a written waiver, had made no explicit oral waiver, but did agree to talk to investigators, that:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda,* mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

Rejecting North Carolina's absolute requirement of an express *Miranda* waiver, the Supreme Court held that "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 374–75, 99 S.Ct. at 1758. *See also Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1978) [mandating inquiry into "totality of the circumstances"].

### 1. *Miranda Waiver by Kimball*

 Sergeant Sprague orally recited the *Miranda* warnings to Kimball from memory immediately upon Kimball's arrest on the steps of the cabin. Kimball claims that he cannot read or write "that well," which must be deemed of little relevance where *Miranda* warnings are given orally. Kimball neither expressed nor displayed any difficulty in understanding or responding to questions at the suppression hearing. Kimball admitted that he has been arrested on three prior occasions when he was similarly advised of his *Miranda* rights.

Kimball claims that he could not concentrate on what Sprague was saying to him concerning his rights because of the "tense" atmosphere,[14] but he admits that when asked whether he understood his rights he answered "yes".

Although the Court finds that Kimball fully understood that he had the right to remain silent and the right to an attorney during any questioning, there was no express waiver of those rights, nor did he affirmatively indicate that he was willing to be questioned. *Compare North Carolina v. Butler,* 441 U.S. 369, 371, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1978); *United States v. Payton,* 615 F.2d 922 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980). Under some circumstances courts have found implied waivers by defendants who have acknowledged that they understood their rights and who then

---

14. Kimball also testified that while Sprague was giving him the "warnings" another officer was speaking and, thus, distracting his attention. However, the officers specifically denied that any other conversations were occurring at that time and the Court finds the testimony of the officers on this point to be more credible.

willingly answered questions. *See Martin v. United States,* 691 F.2d 1235, 1239 (8th Cir.1982); *United States v. Sanders,* 639 F.2d 268, 270–71 (5th Cir.1981); *United States v. Vasquez,* 638 F.2d 507, 525 (2d Cir.1980), *cert. denied,* 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981); *United States v. Velasquez,* 626 F.2d 314, 320 (3d Cir.1980); *United States v. Micieli,* 594 F.2d 102, 107 (5th Cir.1979); *United States v. Stark,* 609 F.2d 271 (6th Cir.1979) (*per curiam*).

Immediately after Kimball was informed of, and admitted that he understood, his rights, Sprague asked him what he knew about the gunfire the previous evening and about an automatic weapon. Although Kimball denied any such knowledge, he was apprised of Sprague's suspicions that Kimball had indeed been involved and that there was an automatic weapon in the area. Sprague refrained from any attempt to obtain admissions outside the cabin. Kimball said little of significance outside the cabin, other than his statement that he had "expected someone," which was followed by his denial of any knowledge of the incident the previous night.

Immediately after entering the cabin with Kimball's consent, Sprague saw Emery and, in Kimball's immediate presence and hearing, again recited *Miranda* warnings, this time to Emery and Dyer, jointly. The significant statements made by Kimball inside the cabin were: (1) his statement to Emery that the officers were looking for the weapon; (2) his nod to Emery in response to Sprague's suggestion that the defendants could make it "easier" by showing the officers the weapon; [15] and (3) his admission that he had fired the gun the night before.

Many of the considerations which cause the Court to conclude that Kimball's consent to search the cabin was voluntary, in spite of the presence of the armed officers, likewise support a finding that Kimball's responses to Sprague's questioning were voluntary. The behavior of the officers and the manner in which they displayed their weapons after Kimball's arrest do not suggest that Kimball was being intimidated by the weaponry. *See United States v. Wertz,* 625 F.2d 1128, 1135 (4th Cir.1980) [critical issue is whether drawn gun intimidated defendant and overpowered will to resist]. His prior acquaintance with Sprague and Knowlton and the tone of their conversation give no indication of coercion or duress. Moreover, Kimball was not alone with the officers, but had two friends close at hand. Finally, the questioning was conducted by Sprague alone, was relatively brief, and was aimed primarily at locating the weapon and learning who had fired it the previous night.

Having just confirmed that he understood his right to remain silent and his right to the presence of an attorney during questioning, Kimball responded to Sprague's suggestion and brief questions, without "indicat[ing] in any manner, at any time prior to or during questioning, that he wish[ed] to remain silent," *see Miranda v. Arizona,* 384 U.S. 473, 86 S.Ct. at 1627; [16] at no time did he request counsel. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *United States v. Downing,* 665 F.2d 404 (1st Cir. 1981). Even when Kimball heard the *Miranda* warnings a second time, as Sprague

---

**15.** Under these circumstances, the act of nodding was a nonverbal statement by Kimball, indicating, *inter alia,* his knowledge of the presence of the automatic weapon inside the cabin. Because the nod to Emery was in response to Sprague's suggestion, its admissibility at trial would depend on compliance with *Miranda. See United States v. Jackson,* 627 F.2d 1198, 1205, 1210–11 (D.C.Cir.1980).

**16.** Some courts have noted that an implicit waiver may be found even where the defendant has assumed the somewhat ambiguous position of refusing to sign a written waiver, and yet responds to questions. *See Martin v. United States,* 691 F.2d 1235, 1239 (8th Cir.1982); *United States v. Johnson,* 529 F.2d 581, 584 (8th Cir.), *cert. denied,* 426 U.S. 909, 96 S.Ct. 2233, 48 L.Ed.2d 835 (1976). *But cf. United States v. Christian,* 571 F.2d 64 (1st Cir.1978) [signing of standard waiver-of-rights form below the statement of rights, but *above* the waiver provision, indicates an intention to stand on rights and not waive them].

advised Emery of his rights,[17] he continued to respond to Sprague's questions.

Kimball's complete awareness of the consequences of responding to Sprague was evidenced by his careful avoidance of any admissions until the weapon was discovered. At the suppression hearing Kimball did not claim that he had not understood what his rights were while at the scene of his arrest. The quality of his responses to questions at the suppression hearing demonstrated an ability to comprehend the straightforward warnings given by Sprague.

The Court therefore finds that Kimball voluntarily, knowingly and intelligently waived his right to remain silent and his right to the presence of an attorney during questioning.

### 2. Miranda Waiver by Emery

█ Neither the defendant nor the Government has addressed the question of whether Emery was in "custody" at the time he was questioned by Sprague. According to Sprague he did not inform Emery he was under arrest until after the incriminating admissions. Sprague's interrogation of Emery, in the course of which Emery was permitted to prepare and serve coffee, might reasonably be viewed as "general on-the-scene questioning as to facts surrounding a crime," *Podlaski v. Butterworth,* 677 F.2d 8, 9 (1st Cir.1982), or as preliminary questioning "to separate a group of persons possibly involved in a crime into those who should and those who should not be arrested," *id.* at 10. And if Emery felt he was not free to leave, this could be attributed to the isolated location and the limited transportation, rather than to anything the officers said or did.

Nevertheless, the Court assumes as the Government has, for purposes of the present motion, that the circumstances surrounding the arrest of Kimball and the entry of the cabin, including the presence of officers inside and outside the cabin and at the dock, constitute an "objective indication that the officers ... deprived [Emery] of

his freedom," *Borodine v. Douzanis,* 592 F.2d 1202, 1208 (1st Cir.1979), at the time they discovered him inside the cabin.

Even if the questioning is characterized as custodial interrogation, however, the Court concludes that Emery was adequately informed of his *Miranda* rights and that he voluntarily, knowingly and intelligently waived those rights by responding to Sprague's questions. Upon hearing Sprague's warnings, Emery, 33 years old and a high school graduate, responded that he was "well aware" of his rights. Having been arrested and warned of his *Miranda* rights on four prior occasions, the present claim that he did not understand his right to an attorney during questioning at the island must be considered doubtful at best.

Emery, like Kimball, was treated with courtesy and restraint, and there is no claim that he was "badgered with a long or repetitive series of questions," *see Borodine v. Douzanis,* 592 F.2d 1202, 1209 (1st Cir.1979). The questioning was conducted by Sprague alone and was brief and informal. Emery gave no indication that he was reluctant to talk or that he wished to invoke his right to remain silent or his right to an attorney. By freely responding to Sprague's questions, Emery, like Kimball, waived his right to remain silent and to the presence of an attorney.

### CONCLUSION

On the basis of the foregoing findings and conclusions the motions to suppress must be DENIED.

---

17. Kimball testified that he recalled the warnings being given to Emery, although he disagreed with Sprague as to the exact sequence of the events inside the cabin.