896 F.Supp. 207 (1995)
UNITED STATES of America, Plaintiff,
v.
Michelle T. MARENGHI, Defendant.
Crim. No. 94-68-P-C.
United States District Court, D. Maine.
July 17, 1995.
*208 *209 Helene Kazanjian, Asst. U.S. Atty., Portland, ME, for the Government.
Daniel J. Perry, WARREN M. SILVER, P.A., Bangor, ME, for defendant.
MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS
GENE CARTER, Chief Judge.
Defendant Michelle T. Marenghi faces a charge of conspiring to possess and distribute a controlled substance containing cocaine base and for the underlying substantive offense, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). Now before the Court is Defendant's Motion to Suppress (Docket No. 12). In the motion, Defendant asks this Court to suppress as evidence in this case any and all statements of, and evidence obtained from, Defendant during the course of the night and early morning hours of her arrest on December 9 and 10, 1994. Defendant also seeks suppression of any and all "fruits" of the arrest and accompanying searches and any reference to such evidence. After receiving testimony in an evidentiary hearing and reviewing the arguments of the parties, this Court concludes that Defendant's motion should be granted in part and denied in part.

I. FINDINGS OF FACT
During the evidentiary hearing held in this matter, the Court was presented with the testimony of three law enforcement officers involved in Defendant's December 1994 arrest. Detective Scott Pelletier of the Maine Drug Enforcement Agency testified regarding his investigation of Defendant and the other individuals arrested with her. Detective Pelletier stated that he began his investigation of Freddie "Pit Bull" Long III, who was Defendant's boyfriend, and another individual known only as "Kenny." Transcript of Direct Testimony of Government Witnesses ("Govt.Tr.") (Docket No. 41) at 5. Police had received information from a "concerned citizen" that those two individuals were expected to arrive on a Trailways bus in Portland, Maine, at a particular date and time in October, bringing crack for distribution in the area. Detective Pelletier went to the bus station at the expected time and saw three individuals who matched descriptions provided by the source. He spoke briefly to the three, and, after body searches consented to by the individuals failed to turn up any drugs, he made no arrests. Id. at 6-7. Long was not among the group questioned at the bus station, but the concerned citizen had mentioned that it had actually seen Long sell drugs at an apartment on Congress Street in Portland, Maine. Id. at 7-8.
A second "concerned citizen" contacted law enforcement officials on or about November 15, 1994, regarding the use of a Park Avenue address for the distribution and use of crack; Long was named as a "main player" in that operation. Id. at 8. The source was known to law enforcement officers as reliable and had provided information on several occasions, two of which led to convictions. Id. at 8-9. The source also informed police that it had learned that Long was staying in Room 108 of the Super 8 Motel on the Portland-Westbrook town line. Detective Pelletier later learned from the motel employees that the room, along with an adjoining room, Room 110, was paid for in cash. Id. at 10-11. They told him that the rooms' occupants received an unusually large amount of "after hours" traffic and telephone calls and that the occupants refused housekeeping services. Id. at 12. The source was unsuccessful in reaching Long at either of the rooms.
Detective Pelletier stated that on or about November 22, 1994, he began surveillance of the rooms from an unmarked vehicle. He saw a man he now knows to be Long and a woman he identified at the hearing as Defendant get into a green car and drive to another motel, the Inn at Portland, which was nearby. Id. at 14-15. The license plate on the car identified it as one leased through Lee Dodge, a local car dealer. Detective Pelletier contacted Lee Dodge and was told that the car was rented by Defendant and that she had provided Room 108 of the Super 8 Motel as a local address. Id. at 16-17. *210 Pelletier also learned that the occupants of Room 108 had checked out of the Super 8 Motel and that, the same day, Defendant had rented Room 122 at the Inn at Portland for which she may have paid cash. Police were able to trace one of the last phone numbers dialed from Room 108 at the Super 8 Motel to an individual known to be a crack user. Id. at 18. Police also learned that a phone call to the same individual was made from Room 122 at the Inn at Portland. Defendant reportedly contacted Lee Dodge to say that she would return the car the next day. Id. at 19.
Detective Pelletier testified that the following day, November 23, 1994, he observed Defendant and Long drive to the front desk of the Inn at Portland and then to the rental office at Lee Dodge where they both went inside. Id. He remained in telephone contact with Lee Dodge employees while they completed the transaction with Defendant and Long. Id. at 20. Defendant returned the car but then rented a Dodge minivan. With Long driving, the two went to a residential building at 1734 Forest Avenue in Portland and went in through a back entrance. Id. at 21. A few minutes later, Detective Pelletier observed Long emerge with two other males, all of whom opened and examined the minivan's doors. Id. at 22-24. Based upon his experience investigating drug distribution operations, Detective Pelletier concluded that the three men were considering how to conceal drugs in the minivan.
While conducting surveillance of Room 110 at the Super 8 Motel on November 23, Detective Pelletier observed an individual leave the room and drop a bag into a dumpster. Id. at 24-26. He removed the bag and found that it contained plastic baggies and "Dominican ties," bags he knew to be often knotted in a particular manner to hold drugs. Id. at 27. Later that day, he observed the three individuals staying in Room 110 leave the motel and get into the Dodge minivan along with Defendant, Long, and another male. Id. at 29-30. Pelletier watched the minivan enter the Maine Turnpike, southbound. Subsequently, Detective Pelletier learned that the room at the Inn at Portland had also received a large number of visitors and numerous telephone calls. Id. at 30-31. The trash can retrieved from the room revealed a Massachusetts traffic citation issued to Defendant, a receipt from L.L. Bean, a plastic baggy, and a Dominican tie. Id. at 31.
On December 6, 1994, a third "concerned citizen," previously unknown by police, told Portland Police that Long's brother, Frederick Long, and a woman, Julie Botto, were dealing in crack out of the Forest Avenue apartment which Detective Pelletier had previously seen the Defendant and Long enter. Id. at 32. Detective Pelletier learned from other officers that this source claimed to have been present at the Forest Avenue apartment. Id. at 33.
The source told police the following day that Frederick Long and Julie Botto were expected to make a purchase of crack in Massachusetts and bring it to Portland within the next few days and provided the name of a particular customer. Id. at 34. Surveillance of the Forest Avenue location revealed that a person driving a truck on which was painted the last name of the customer named by the source painted on it went into the residence. Id. at 34. The source subsequently told police that the trip to purchase crack was postponed until December 9, 1994, and that Botto and Frederick Long would be leaving on a 1:30 p.m. bus to Boston and returning on a bus that evening. Id. at 36-38. Two officers followed Botto and Frederick Long to the bus station and observed them leaving on a 1:30 p.m. bus to Boston. The source subsequently told police that Botto and Frederick Long would not be returning on the bus but rather would be driving back with Defendant and Long later that night. Id. at 38.
Detective Pelletier sought a search warrant for the persons of Botto and Frederick Long and for the premises at Forest Avenue on the basis that they were suspected of transporting cocaine base. Id. at 40. While Detective Pelletier prepared and presented the warrant applications during the evening of December 9, 1994, Portland Police Detective Bruce Chase was positioned near Exit 8 of the Maine Turnpike, the exit closest to the Forest Avenue residence, other officers waited *211 outside the Forest Avenue apartment. Govt.Tr. at 136. He was instructed to watch for three to four African-American males and two white females travelling in a 1994 Ford Taurus station wagon. Id. at 137-38. At 10:50 p.m. Officer Chase spotted a station wagon which matched the description of the vehicle in which Botto, Frederick Long, Long, and Defendant were thought to be riding. Chase could see two white females in the front seat and four African-American males in the back seat. Id. at 138. Chase followed the car to the Forest Avenue residence. Detective Pelletier, who was on his way to obtain the search warrants, instructed the officers at the Forest Avenue residence, via radio or telephone, to stop and detain the car and its passengers but not to enter the house since the warrants had not yet been signed. Govt.Tr. at 43.
As the station wagon pulled into the driveway at the Forest Avenue address, a police car pulled in behind it. Id. at 140. Detective Chase testified that he had pointed his gun at the car as he instructed the car's occupants to raise their hands. During the hearing Chase identified Defendant as the driver. Id. at 155.
After all of the occupants of the car had been removed from the vehicle and split up to be detained at the scene, Detective Chase searched the passenger compartment of the car. Chase testified that he retrieved a woman's purse with Defendant's identification, blank money orders in excess of $3,000, and a planner book. Id. at 143-45. When Detective Pelletier had the signed search warrants in hand, so he notified officers at the scene and a drug-detecting canine, which had been brought to the scene, was used on the car and some of the occupants.[1]Id. at 161-62. The dog did not alert to any location in the interior of the car. Id. at 161. The dog was used on the other occupants of the car and alerted to the presence of drugs on Botto and Long. Id. at 162-63. The dog was never used on Defendant. Id. at 164.
Scott Pelletier arrived at the scene forty to fifty minutes after the car and its occupants had been first detained. Id. at 44. He got into a red Camero in which Defendant was handcuffed in the back seat and in which Portland Police officer Robert Pelletier also sat. Id. at 44-45. Robert Pelletier remained in the car during Scott Pelletier's remarks to Defendant. Scott Pelletier testified that he explained to Defendant why the car had been stopped and what the next steps of the "procedure" would be. Id. at 46. Scott Pelletier also told Defendant that he knew that she was Long's girlfriend, about the hotel rooms and rental cars, and that either she or the others were carrying crack cocaine. Id. at 346-47. He informed her that the drug-detecting dog had alerted to drugs on Botto and Long and that it would be used on her as well.[2] He stated that if the dog alerted to the presence of drugs on her, a woman officer would search her. Id. at 47. He testified that he told Defendant that:
I would give her this time to think about what she wanted to do, that no one else out there, none of these other people out there that she was with was going to help her, that she needed to make a decision about whether she wanted to tell me what happened, and cooperate, in fact the dog had not yet been used on Ms. Marenghi yet, that the dog was going to detect whether or not she had any drugs on her....
Id. Scott Pelletier told her that when she got to the station, her Miranda rights would be read to her and that a lawyer could be *212 obtained but that it would not be that evening.[3]Id. at 46. Scott Pelletier testified that he wanted Defendant to "reflect on this to make a decision before I got out of the car." Id. at 47. Defendant responded, "I really don't know anything about the crack." Id. Before this conversation, no officer had administered Miranda warnings to Defendant.
Scott Pelletier got out of the Camero, and then Robert Pelletier told Defendant: "He's not kidding around. This is serious stuff." Id. at 173. He also told her that a drug-detecting dog could find drugs anywhere on a person, including in any body cavities. Defendant then said to Robert Pelletier, "I don't have it up there, I have it down here." Id. at 174. Robert Pelletier got out of the car and said to Scott Pelletier, "I believe she wants to talk to you." Id. at 175. When Scott Pelletier when he returned to the Camero, Defendant told him that the officers would not need to use the dog and that she had crack on her person. Id. at 52.
Scott Pelletier transported Defendant to the Portland Police station. Upon arrival, Defendant was left in a room with Officer Chase while Detective Pelletier attempted to locate a female officer to search Defendant. Id. at 53. Defendant had informed Detective Pelletier, both at the arrest scene and at the police station, that she needed to use the bathroom. Transcript of Defense Witnesses ("Def.Tr.") (Docket No. 32) at 13, 15. He responded to these requests by telling her that she must have a female officer accompany her and that she would need to wait until he could locate that officer. After ten minutes, he returned to the room where Defendant was detained and read her Miranda rights to her. During his testimony Detective Pelletier read from the card he uses to administer Miranda warnings, and a copy of the card was introduced in evidence. Govt. Tr. at 53-57; Government Exhibit 11. He asked Defendant if she understood what the rights meant, and she responded that the right to remain silent meant that she did not have to talk to him. Id. at 54. She said that she understood her right to an attorney but that she was willing to talk to him without the presence of an attorney. Id.
After Detective Pelletier was unable to locate a female officer, he asked Defendant if she would be able to retrieve the drugs easily. She said that she could and reached into her pants and produce a plastic bag which she placed on the floor as he instructed her to do. Id. at 58. It was unclear from the record where Defendant was standing when she removed the bag. See Govt.Tr. at 57-58, 152-53; Def.Tr. 35. Officer Chase was also present when Defendant produced the drugs. Govt.Tr. at 145.
After turning over the crack cocaine, Defendant spoke to Detective Pelletier alone in a room. She then made statements to him which he wrote down in the form of a written statement for her to sign. Id. at 62-63. He testified that he left Defendant alone with the statement and then watched her read *213 and initial each page of the statement. Id. at 62. At 3:15 a.m., and with the exception of one small change, she signed the statement as Detective Pelletier had written it. He testified that, at all times, Defendant appeared to understand what he was saying and that she spoke freely. Id. at 65.

II. DISCUSSION
Defendant raises several matters in this motion. She argues that her constitutional rights under the Fourth and Fifth Amendments were violated in the following ways: (1) her arrest was made without a warrant and in the absence of probable cause; (2) the search and seizure of the rental car in which she was riding was without a warrant and without probable cause; (3) she was subjected to custodial interrogation without being warned of her rights under Miranda; (4) statements she made were coerced and involuntary; and (5) statements she made at the police station were the result a continuation of the coercion present at the arrest scene and were fruits of the illegal arrest.

A. Probable Cause for Defendant's Arrest
Defendant argues that she was under arrest from the moment that her car was blocked in the driveway at 1734 Forest Avenue and that the arrest was not made on the basis of probable cause. She asserts that the only basis upon which she was arrested was her association with persons suspected of criminal activity. The Government counters this argument by stating that the law enforcement officers had sufficient probable cause to arrest or at least temporarily detain Defendant.
The United States Supreme Court has repeatedly declined to announce any bright-line test to determine the presence of probable cause in any given case. This reluctance reflects the Court's view that probable cause is "a practical, nontechnical conception," Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), and that "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The Supreme Court has also noted that "probable cause is a fluid concept  turning on the assessment of probabilities in particular factual contexts." Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).
In this case, the Government clearly had probable cause to stop the car and to detain and question its occupants. The investigation leading up the arrest that evening consisted of information from three confidential sources with sufficient indicia of reliability, corroborated in material respects during several days of surveillance of Defendant and of others who were in the car with her. When the car was first identified by Officer Chase, it fit the description of a car returning from Massachusetts and said to contain contraband. The car went directly to an address which had been under surveillance in the investigation and which was alleged by a confidential source to be a drug trafficking location. The information known to law enforcement officials prior to stopping the vehicle established probable cause for three search warrants: two for individuals in the car and one for the residence where the car stopped. Since the car's occupants were suspected of having committed a crime or being in the process of committing a crime and carrying contraband, police had probable cause to stop the car and detain its passengers for possession of contraband substances.[4]
*214 Agents also had specific information regarding Defendant that established probable cause for her arrest for participating in drug trafficking activity. Defendant was seen entering and leaving an apartment and motel rooms reported to be drug trafficking locations and with individuals alleged to be distributing contraband. She rented one of the rooms in her name and possibly paid for it with cash. She was driving a car in which individuals reported to be transporting drugs from Massachusetts were present. Investigating officers had searched the trash from a motel room in which she had stayed and had found papers bearing her name along with drug paraphernalia. At the arrest scene, officers found a planner, identification papers with Defendant's name and approximately three thousand dollars in blank money orders. Also, a drug-detecting canine had alerted to the presence of drugs on at least two of the car's passengers.
In short, Defendant was not merely in the presence of persons suspected of criminal activity; the information available to agents at the time of the arrest indicated a high likelihood that Defendant herself was transporting drugs as part of a drug trafficking conspiracy. This Court concludes that all of the information available to the arresting officers at the time of Defendant's arrest demonstrates that officers had probable cause to arrest her on December 9, 1994, for involvement in drug trafficking activity and possession of contraband.

B. Search of the Rental Car
As discussed above, law enforcement officials had probable cause to stop the car and to arrest Defendant. Specifically, agents also had probable cause to believe that the car's passengers were transporting contraband. The officers were not required to obtain a search warrant prior to searching the vehicle and any containers within it since they had probable cause to believe that the car may have contained contraband or other evidence of drug trafficking. California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991). In addition, the search was incident to the lawful arrests of Defendant, Botto, and others. New York v. Belton, 453 U.S. 454, 460-61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). The Supreme Court has held on several occasions that a "lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area," to prevent the destruction of evidence and to remove any weapons. Id. at 457, 101 S.Ct. at 2862. In Belton, the Supreme Court held that when the arrestee is an occupant of an automobile, a law enforcement official may search the entire passenger compartment of a vehicle and any containers within that compartment without a warrant. Id. at 460, 101 S.Ct. at 2864.

C. The Admissibility of Defendant's Statements

1. The Statements Made at "Roadside"
Defendant contends that her statements made at the arrest scene were obtained in violation of her Fifth Amendment rights and the principles articulated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), since she was subjected to custodial interrogation without prior knowledge of her rights and in the absence of a knowing, intelligent, and voluntary waiver of those rights. Defendant further alleges that the statements she made during her arrest were coerced.
Under Miranda, before an individual is subjected to custodial interrogation she must be advised of her right to remain silent, that anything she says may be used against her, that she has the right to consult an attorney before questioning and to have the attorney present during the questioning, and that, if she cannot afford an attorney, one will be appointed for her. United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir.1993). Even if a person is not under arrest he or she can nonetheless be "in custody." Although brief detentions, such as those permitted under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "`do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings,'" United States v. Streifel, 781 F.2d 953, 958 (1st Cir.1986) (quoting United States v. Bautista, 684 F.2d 1286, 1291 (9th *215 Cir.1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446, 447 (1983)), a person subjected to a Terry stop "must be advised of [her] Miranda rights if and when [s]he is `subjected to restraints comparable to those of a formal arrest.'" Id. at 958 (quoting Berkemer v. McCarty, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)).
The determination of whether a suspect is "in custody" is based upon what a reasonable person in the suspect's position would conclude. Berkemer, 468 U.S. at 442, 104 S.Ct. at 3151-52. Defendant was clearly "in custody" while she was detained in the Camero automobile. She was handcuffed from behind and placed in the back seat, and a police officer, Robert Pelletier, remained in the vehicle with her. She was detained there for at least thirty to forty-five minutes before Scott Pelletier talked to her. She was told that she would be subjected to a "search" by a drug-detecting canine and possibly by a female officer.
"Interrogation," for purposes of Miranda warnings, is not necessarily limited to "questioning," as the term is commonly understood to mean, but can include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (footnotes omitted). The focus in applying such a standard is the "perceptions of the suspect, rather than the intent of police." Id.
Here, although the statements of Scott and Robert Pelletier were not phrased in the form of questions, in that they did not literally end with question marks, they were clearly attempts to induce Defendant to state whether she was carrying any drugs. Scott Pelletier attempted to extract this information from her by telling her that he knew all about the alleged drug trafficking, that none of her companions would help her, and that a drug-detecting canine, which had already alerted to the presence of drugs on two other persons in the car, would be used to determine if she had any drugs. When Scott Pelletier urged her to "think about" her options, he failed to explain to her that among her options was her right to remain silent and to seek the advice of counsel. The characterization of Scott Pelletier's remarks by Robert Pelletier indicates that the officers were attempting to elicit information while "technically" avoiding a Miranda issue by making "statements" such as "tell me ..." rather than by asking questions. See note 1, supra. Defendant clearly interpreted the remarks this way when she responded at first that she did not know about any crack but later told the officers that she had crack on her.
The statements by Robert Pelletier regarding the fact that the drug-detecting canine could detect drugs packed into a body cavity was clearly, and successfully, an attempt to draw out a statement from Defendant by the threat of an invasive search  by either a dog, a doctor, or an officer, as far as Defendant knew  of her vagina. Def.Tr. at 10; Government Exhibit 10 at 4 (notations by Dr. Vanelli during interview with Defendant that she thought that she would have to strip and the dog would sniff her genitals). Defendant's response that the drugs were not "up there" and that they did not need to "use the dog" on her indicate that Defendant was making these inculpatory statements to avoid being subjected to the threatened searches. The two officers' statements and strategy were clearly aimed at convincing Defendant that she had little choice but to tell the officers that she had drugs on her person. The strategy was employed without any adequate explanation to Defendant of her right to resist disclosure of the drugs.
Accordingly, since the statements made by Defendant at the arrest scene, including but not limited to her statements that she had crack cocaine on her person, were obtained in violation of Defendant's rights under the principles outlined in Miranda, these statements will be suppressed at trial.

2. The Statements Made at the Police Station
Defendant argues that because her earlier statements at the roadside were made without *216 the proper administration of her Miranda rights, the confession she provided a few hours later at the police station is "tainted" and must also be suppressed. In Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court rejected the wholesale importation of the "fruit of the poisonous tree" metaphor to prevent any subsequent admissions from being admitted against a defendant if an earlier statement was obtained without previously administered Miranda warnings. Id. at 306, 105 S.Ct. at 1291. The Supreme Court held that where an earlier statement was voluntary, the proper administration of Miranda warnings for the subsequent statements should "suffice to remove the conditions that precluded admission of the earlier statement." Id. at 314, 105 S.Ct. at 1296.
Even if this Court were to find that the statements at roadside were not only obtained in violation of Miranda but were actually coerced, constituting a violation of Defendant's Fifth Amendment rights, such a finding would not automatically compel the suppression of the later confession. In addition to determining whether the latter statement was made after a knowing, intelligent, and voluntary waiver of her right to remain silent and to confer with counsel, a court should look to the circumstances of the two statements to determine if the coercion of the earlier statements operates to render the later "Mirandized" statement essentially involuntary as well. Westover v. United States, 384 U.S. 436, 496, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694 (1966) ("We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings."). The Supreme Court has suggested that courts consider whether a suspect was subject to questioning by different persons in different locations with some amount of intervening time between the two interrogations. Id.
Here, the circumstances suggest that the statements made in the police station were sufficiently removed from the setting of the illegally obtained, and possibly coerced, inculpatory statements in the Camero. There was a change in the time and circumstances of the statements. The confession was provided a few hours later in the police station. At that time, Defendant was fully apprised of her rights and, as discussed infra, she made a knowing and intelligent waiver of those rights. There was no longer the threat of the use of a drug-detecting canine. Although Scott Pelletier was present during both statements, there is no evidence that he used any coercive tactics or threats at the police station. Accordingly, the Court concludes that, even if her earlier statements could be characterized as coercive, her subsequent confession was not impermissively tainted by the illegality. See United States v. Daniel, 932 F.2d 517 (6th Cir.) (applying same analysis to comparable facts), cert. denied, 502 U.S. 890, 112 S.Ct. 252, 116 L.Ed.2d 206 (1991).
Of course, the later statements must themselves be voluntary to be admissible. Elstad, 470 U.S. at 318, 105 S.Ct. at 1297-98. Defendant argues in her motion that the statements she made to Detective Pelletier at the police station should be suppressed on the basis that they were the product of coercion. In order to successfully demonstrate that her statements were coerced, Defendant must demonstrate some specific conduct by a law enforcement official constituting coercion. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 521-22, 93 L.Ed.2d 473 (1986). The record does not contain any evidence of conduct by any of the investigating or arresting officers which could be said to coerce Defendant. Even if Defendant were to argue that, due to her limited mental capabilities, she was particularly susceptible to police questioning tactics, her argument would nonetheless fail absent a showing of police misconduct. Id. ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not `voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.")
Defendant has suggested through the presentation of evidence at the hearing in this matter that, due to the arresting officers' refusal for a substantial period of time to permit her to use a bathroom, she was willing to say anything to obtain permission to *217 go to the bathroom. Def.Tr. 13-15. Detective Pelletier explained to the Court during the hearing that the Maine Drug Enforcement Agency has no female officers and that there was only one female Portland Police officer on duty in the entire city and, although he had tried to arrange for her availability that evening, that officer was called away to investigate a rape. Consequently, there was no officer to accompany Defendant to the bathroom.
Although the Court is reluctant to excuse the arresting officers' denial of bathroom facilities to Defendant for the length of time they did, the Court recognizes that the marked underrepresentation of woman in local law enforcement agencies was a circumstance outside the control of the officers that night. Furthermore, the Court is not persuaded that Defendant's attempt to use the bathroom was other than a ploy to obtain an opportunity to destroy evidence. Detective Pelletier's reluctance to permit her to use the bathroom alone was a proper recognition of the fact that she would probably attempt to dispose of the drugs and, therefore, his inability to immediately provide a female officer to accompany her to the bathroom was not due to any misconduct on his part.

3. Defendant's Waiver of Her Miranda Rights
Defendant presented evidence to this Court suggesting that, due to her limited cognitive abilities, she did not knowingly and intelligently waives her rights under Miranda. In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated that a defendant's statements made during custodial interrogation may be used against her only if the defendant had previously made a voluntary, knowing, and intelligent waiver of her rights under the Constitution. Id. at 444, 86 S.Ct. at 1612. The burden is on the Government to prove such a waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. at 168, 107 S.Ct. at 522.
A court must determine through a two-part inquiry whether such a waiver occurred: (1) was the waiver "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) was it made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). The analysis of the validity of a waiver of Miranda rights must consider "the totality of the circumstances and the facts surrounding the particular case, `including the background, experience, and conduct of the accused.'" United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir.1993) (quoting North Carolina v. Butler, 441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979)). The Government must demonstrate the existence of "the intention, intelligently exercised, to relinquish a known and understood right." Id.
Although voluntary, a confession will, nonetheless, be inadmissible if the defendant "lacks the mental capacity to make a knowing and intelligent waiver" of her Miranda rights. Guam v. Muna, 999 F.2d 397, 400 (9th Cir.1993) (quoting Moran, 475 U.S. at 421, 106 S.Ct. at 1140-41). A law enforcement officer must do more than simply ask the defendant if she understands her rights; the officer should ascertain whether the defendant is making a knowing and voluntary relinquishment of her rights. United States v. Porter, 764 F.2d 1, 7 (1st Cir.1985), cert. denied, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).
Defendant presented evidence, through her own testimony and that of an expert witness, Dr. Mark Vanelli, to suggest that she lacked the cognitive abilities to waive her Miranda rights knowingly and intelligently. Although several courts have considered defendants' limited mental capacity when determining whether the requirements of a waiver were met, courts have concluded, for the most part, that "no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving ... the constitutional rights embraced in the Miranda rubric." Fairchild v. Lockhart, 744 F.Supp. 1429, 1453 (E.D.Ark.1989) (collecting and discussing several federal cases where the defendants' limited cognitive abilities *218 were a factor in determining the validity of the waivers). See also, Dunkins v. Thigpen, 854 F.2d 394, 398-99 (11th Cir.1988), cert. denied, 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); United States v. Young, 529 F.2d 193, 195 (4th Cir.1975); United States ex rel. Lopez v. Chrans, 696 F.Supp. 1210, 1212 (N.D.Ill.1988).
Dr. Vanelli testified that he had reviewed Defendant's school records and the results of various cognitive function tests administered by a colleague, Judy A. Bevis, Ph.D., at his request. Dr. Bevis' tests revealed that Defendant tested in the first percentile (meaning that ninety-nine out of one hundred individuals would score higher than her) on the "amount of information she was able to recall." Def.Tr. at 58. She scored in the fifth percentile in vocabulary and arithmetic. Her verbal IQ was 79, a score in the "borderline" range of functioning, with a score of 69 or lower indicating mental retardation. Id. Dr. Vanelli did not find any psychosis but concluded that Defendant's "reality testing was quite deficient.... [with] difficulty interpreting information in a realistic and conventional manner." Id. at 64.
Dr. Vanelli also testified that he had reviewed the results of tests similar administered to Defendant at the ages of six, eleven, and seventeen. Id. at 65. These tests revealed a serious deficiency with understanding spoken language. Id. at 67-68. She also scored poorly at general information and knowledge. Dr. Vanelli's diagnosis, derived from his review of all of these test results, is of a "mixed perceptive language disorder." Id. at 67. The diagnosis reflects Dr. Vanelli's conclusion that, in terms of Defendant's ability to understand spoken language, "It is hard for [Defendant] to get the meanings, to understand the main points as someone else might." Id.
Defendant testified that, although Detective Pelletier did administer Miranda warnings at the police station the night of her arrest, she did not understand the precise content of the warnings and she never told Detective Pelletier that she was willing to talk to him. Id. at 19. On cross-examination, Defendant explained her understanding of her Miranda rights as they were recited to her by Detective Pelletier. She stated that she understood the words "[y]ou have the right to remain silent" as indicating that "I didn't have to speak that night because he told me I had to give him a statement." Id. at 30-31. She testified that she was told that anything she said could be used against her in a court of law but did not think that the statements she provided that night could be used against her. Id. at 31. She further testified that she interpreted "[y]ou have an absolute right to the advice of a lawyer before any questioning and to the presence of a lawyer here with you during questioning" to mean that "if it went to court, that is when I was able to get an attorney. I did not know I could get an attorney that night." Id. at 32.
The evidence presented at the hearing also revealed that Defendant is a junior at Lasell College in Newton, Massachusetts, majoring in retail and fashion merchandizing, and that she takes six courses each semester. She further testified that she has received some grades of "A" at Lasell and that she has taken courses in accounting and statistics. Id. at 42. She stated on redirect examination that she attends Lasell as part of a "special program ... for girls who have problem[s] in academics." Id. at 46. The program requires Defendant to report to a learning center each day and to go over her notes and homework with a tutor, with special attention to her vocabulary. Id. She further testified that she was enrolled in "remedial special education classes" during high school due to dyslexia and because she could not "keep up" with the other students her age in reading, vocabulary, and spelling. Id. at 47. Defendant's sister also testified regarding Defendant's cognitive deficiencies. She stated that she had tutored Defendant for many years and that Defendant often confused directions on cooking recipes. Id. at 51-52. Her sister also testified that Defendant has failed some courses at Lasell. Id. at 53.
Although this evidence clearly suggests that Defendant has some cognitive limitations in the area of language comprehension, it does not preclude a finding that Defendant made a knowing and intelligent waiver before *219 providing her statement to Detective Pelletier. This Court must consider all of the circumstances of the waiver. There is no evidence that Defendant was intoxicated or otherwise impaired in her comprehension. Although she does have some language difficulties, she nonetheless attends college level courses and has received satisfactory marks. Dr. Vanelli acknowledged that, although she is limited in academic and other test-taking performances, Defendant is able to function quite well in her day-to-day life. The context of the waiver also suggests that it was knowing and intentional. There is no dispute that Detective Pelletier provided the warnings prior to questioning. In addition, he testified that he not only read the warnings from a card he carried with him but that he also asked Defendant to respond to the warnings by stating what she thought the warnings meant. The answers she provided that evening indicate that she did have a satisfactory comprehension of the substance of the warnings to make a knowing and intelligent waiver. She did not act inconsistently with her stated understanding of the rights. There is no evidence that, at the time the warnings were given and during the subsequent questioning, Defendant manifested expressly or by implication from her words and actions any lack of comprehension of what was said to her or of what was occurring.
Moreover, an expert witness called by the Government, Dr. Donna Durham, a Special Education Consultant to Portland Public Schools, who had reviewed the testimony of Defendant and Detective Pelletier along with all of the tests and reports relied upon by Dr. Vanelli, testified that, given the manner and content of the Miranda warnings, as described by Detective Pelletier in his testimony, Defendant would be able to understand them. The Court finds this testimony persuasive in the circumstances. Dr. Durham suggested several ways in which Defendant's limited test-taking skills do not reflect her ability to understand and respond in day-to-day interactions with others. Accordingly, the Court determines that Defendant did provide a knowing, intelligent, and voluntary waiver of her rights.

D. The Crack Cocaine
Finally, although Defendant did not seek suppression of the cocaine base she produced at the police station, this Court has considered whether the drugs constitute evidence "tainted" by the failure to administer Miranda prior to custodial interrogation at the arrest scene. Although certain statements are obtained illegally, it does not follow automatically that any evidence obtained thereafter is tainted and, therefore, inadmissible. If the evidence was "gained from an independent source," it may still be introduced at trial. Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). In addition, even if evidence was obtained as a result of improper police conduct, if a court concludes that the evidence would have been discovered inevitably in the absence of police misconduct, it is nonetheless admissible. Nix v. Williams, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 2508-09, 81 L.Ed.2d 377 (1984).
Here, the drugs were discovered when they were because of Defendant's statements at the arrest scene that she had drugs on her, statements which were obtained in contravention to the principles in Miranda. However, even if she had never made those statements, the agents clearly would have learned at the arrest scene that she was carrying drugs since, presumably, she, too, would have been subjected to a drug-detecting canine which would have alerted to the presence of drugs on her. Furthermore, she was in custody and the contemplated search by a female police officer would have found them. Therefore, it was inevitable that officers would have been informed of the presence of drugs on her person even if she had said nothing regarding the drugs.

III. CONCLUSION
Accordingly, Defendant's Motion to Suppress is GRANTED with respect to any and all statements made by Defendant at the scene of her arrest in front of 1734 Forest Avenue, Portland, Maine on December 9-10, *220 1994, and is DENIED in all other respects to any other evidence.
So ORDERED.
NOTES
[1] The validity of the search warrants obtained that evening is not at issue in this motion.
[2] Robert Pelletier, in his testimony, denied that Scott Pelletier questioned Defendant during this exchange but nonetheless stated:

Q: (by Attorney Perry) Was [Scott Pelletier] asking questions?
A: Not any questions.
Q: He didn't ask her if she had drugs on?
A: I think he asked, I think he made a statement.
Q: What do you mean?
A: As far as ["T]he dog has already done his work on the other female and so if you have any drugs, you probably ought to think about it.["]
Q: Your impression was that Scott, he wanted Michelle to tell him if she had drugs on her?
A: I think it was a statement, ["I]f you have any drugs, tell me.["]
Govt.Tr. at 181 (emphasis added).
[3] At the evidentiary hearing in this matter, the Court questioned Detective Pelletier regarding his statement that Defendant could not have an attorney appointed that evening. He stated that if she had wanted to contact her own attorney immediately, he would have permitted her to do so. Id. at 49. Due to the time of night, however, he did not say that she could have an attorney provided that night but had informed her that she had the right to an attorney prior to any questioning. Id. at 50-51.

In this Court's opinion, Detective Pelletier's explanation to Defendant skirted dangerously close to misleading Defendant in her understanding of her rights. Under the present case law from the Supreme Court, however, Detective Pelletier's statement is not constitutionally defective. Certainly the phrasing is more accurate than that upheld by the Supreme Court in Duckworth v. Eagan, 492 U.S. 195, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), in which the interrogating officer told the defendant that he had the right to the advice of an attorney prior to questioning and that: "We have no way of giving you a lawyer, but one will be appointed for you, if and when you go to court." Id. at 198, 109 S.Ct. at 2877. The Court held that "Miranda does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford him." Id. at 204, 109 S.Ct. at 2881. Clearly the warning administered by Detective Pelletier satisfied these basic requirements. See also United States v. Kimball, 555 F.Supp. 1366, 1377 (D.Me.1983) ("`A Miranda warning need not explicitly convey to the accused his right to appointed counsel "here and now."'") (quoting United States v. Contreras, 667 F.2d 976, 979 (11th Cir.1992)).
[4] Furthermore, even if this Court were to conclude that agents did not have probable cause at the time the car was initially detained, such a finding would not necessarily render Defendant's arrest invalid. Law enforcement officials may detain persons to question them briefly if the officials "have an articulable and reasonable suspicion that [s]he is engaged in criminal activity." United States v. Streifel, 781 F.2d 953, 957 (1st Cir.1986). Here, the officials had received information that the car and its passengers were carrying contraband. The additional evidence validly obtained during the temporary detention  namely, the money orders and the presence of drugs on at least two of the car's passengers  provided the requisite probable cause to arrest Defendant, the driver of that car, on drug conspiracy charges.