**UNITED STATES of America, Plaintiff,**

v.

**Ada MELENDEZ GARCIA, Defendant.**

**Criminal No. 95–235(DRD).**

United States District Court,
D. Puerto Rico.

Nov. 3, 1997.

Jeanette Mercado–Rios, U.S. Atty's Office Dist. of PR, Crim. Div., Hato Rey, PR, for U.S.

Ramon Garcia–Garcia, Santurce, PR, Steven Potolsky, Miami, FL, for Defendant.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendant, Ada Meléndez Garcia, has requested the Court to suppress evidence. Defendant's main thrust is that due to her limited intellectual and cognitive ability[1] she did not knowingly and intelligently waive her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda* the Supreme Court established that

a defendant's statement procured or made during custodial interrogation may be used only if the accused has prior thereto made a voluntary, knowing, and intelligent waiver of the defendant's rights under the Constitution. *Miranda*, 384 U.S. at 446, 86 S.Ct. at 1612. The burden to prove such a waiver is on the government using the standard of a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

■ The Court is obligated to perform a two-step inquiry in order to determine the validity of the waiver: (1) Was the waiver "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and, (2) was the waiver provided with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

■ In performing the analysis to determine the legitimacy of a waiver under *Miranda*, the Court must consider "the totality of the circumstances and the facts surrounding the particular case 'including the background experience and conduct of the accused.'" *North Carolina v. Butler*, 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir.1993) (citing *North Carolina v. Butler*). The United States must demonstrate the existence of "the intention, intelligently exercised, to relinquish a known and understood right." *Id.*

■ Notwithstanding that a confession be voluntary, the same will be inadmissible if the defendant "lacks the mental capacity to make a knowing and intelligent waiver" of *Miranda* rights. *Moran*, 475 U.S. at 421, 106 S.Ct. at 1140–1141.

■ A law enforcement officer is required to probe more than merely asking the defen-

---

1. On the subject of potential lack of cognitive ability to provide a valid waiver under *Miranda*, the Court recognizes an excellent opinion containing a succinct discussion of the applicable standards written by fellow District Judge Gene Carter in the case of *United States v. Marenghi*, 896 F.Supp. 207, 217 (D.Me.1995), *aff'd on other grounds* 109 F.3d 28, 33 n. 3 (1st Cir.1997). This Court adopts, paraphrases, and reiterates the legal criteria well set forth in said opinion.

dant if she understands her rights. The officer should further verify that the defendant is "making a knowing and voluntary relinquishment of her rights." *United States v. Porter*, 764 F.2d 1 (1st Cir.1985), *cert. denied* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).

The Court proceeds to perform the two-part inquiry required under *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. 1140, to determine if the waiver of constitutional rights under *Miranda* is to be considered voluntary, knowing, and intelligent.

## I.

"Voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1140.

The Court reiterates that the proper standard places the burden of voluntariness upon the government on a preponderance of evidence standard. *Colorado v. Connelly*, 479 U.S. at 168, 107 S.Ct. at 522. The Court is further guided by the "totality of circumstances" doctrine. *North Carolina v. Butler*, 441 U.S. at 374–79, 99 S.Ct. at 1757–60.

■ The Court first examines the waiver provided by Defendant as to the search of her residence on June 25, 1995 at 6:34 P.M. (Ex. 1.) Mr. Daryl G. Huff, an FBI agent working for the agency in excess of ten years credibly testified that on said date he obtained the consent of Defendant Ada Meléndez to search her house. Prior thereto the Defendant was advised that he and two other agents were searching for evidence relating to the disappearance of Edna Rivera Hernández her son Brian. The agents had been led to Defendant Ada Meléndez on information she was the girlfriend of codefendant Gregorio Aponte Lazú. Mr. Huff read the form to the Defendant in Spanish and it was explained to her by agent José Torres from the local police assigned to an FBI Task Force. The Defendant stated upon questions by Mr. Huff that she understood the consent form for search of her residency. "We entered with her through the front room [Agents Huff, Torres Diaz, and Jorge Má-

quez] and that is where we stayed until she gave us consent." The Defendant signed the consent form by making an "X." (Ex. 1.) Afterwards, Defendant "showed us the [other] rooms." (Tr. at 7, 8–26–97.) "She accompanied us to the living, kitchen, and two bedrooms." (tr. at 11, 8–26–97.) The Defendant later admitted to signing the form although she insists that the form was not explained to her. (Tr. at 80, 8–26–97.) The Court notes that the form was signed when Defendant was accompanied by her husband early in the evening. The Court credits the version of facts testified by FBI Agent Huff. At this early time there were only three agents entering with her and her husband to the residence and Defendant did not provide any credible evidence of intimidation, coercion, or deception. The Defendant later testifies as to alleged intimidation relating to the waiver signed at 9:11 p.m. on the same date. (Tr. at 81, 8–26–97.) The Court concludes, considering the "totality of circumstances" that the notice of rights waiver form as to the search of the residence was read to the Defendant, explained to her and that no "intimidation, coercion, or deception" occurred as to the consent of a property search.

Sometime after 6:40 p.m., (Ex. 1), but before 9:11 p.m., (Ex. 9), an ATH Banco Popular electronic receipt related to the victim was found in the outside of the residence, the trash cans, of the Defendant Ada Meléndez. The matter was informed and consulted with District Attorneys Office thereafter, the Defendant was immediately detained and shortly later the Defendant signed with an "X" a waiver of constitutional rights form which was read to her and explained by local Police Agent Torres. By then a close friend, Elizabeth Rivera Gómez who helped defendant read and write letters to codefendant Aponte Lazú was present at the residence of Defendant Meléndez. The friend also signed the waiver. (Tr. at 5–7, 9–23–97.)(Ex. 9.) The children of Elizabeth Rivera were then also playing outside in the patio. (Tr. at 80, 9–23–97). The Defendant signed with an "X." A few hours later Defendant guides the agents in a search for the body of the victim. (Ex. 3.) Although the defendant alleges that the waiver signed with an "X" by her around

9:11 p.m. was not explained to her and that she was intimidated and forced to sign the same, (Tr. at 80–85, 9–23–97), the Court concludes that the rights were read to her, she understood the same (Agent Torres Diaz), (T. at 70, 9–23–97), and the "totality of circumstances" indicates that there was no "intimidation, coercion, or deception" (a friend was allowed to be with her—the friend signed the waiver—children of the friend are allowed in the property—the Defendant later that same night led the agents in all night search to attempt to find the body of the victim, (Tr. at 15–16) (Ex. 3), in places very near the locality where the body of the victim is eventually found. (Tr. at 15–16, 8–26–97.))

The Defendant signed a third notification and waiver of rights form document the next day at around noon, after she is read the waiver form in Spanish by Agent Ivan Lopez (Tr. at 14, 9–23–97.)(Ex. 5.) Defendant signed as Ada Meléndez in block letters—no evidence is provided as to any intimidation or coercion on this date. The defendant understood the waiver: "I did see nods." and "she did say yes". (Tr. at 14, 9–23–97.) "I saw the normal expression of a person that is understanding." (Tr. at 15, 9–23–97.) Iván Cruz has a daughter that is mentally retarded. (Tr. at 17.). The eye contact was direct and "appeared to be sincere." The defendant was asked about understanding the waiver "after each paragraph." (Tr. at 15.) The Court concludes that the notification and waiver was read to the Defendant and that the "totality of circumstances" inescapably points to no "intimidation, coercion, or deception" in the signing of this particular waiver form document.

The final legal notice and waiver form document was signed by Defendant on June 28, 1995, at around 2:42 P.M. (Ex. 10.) The defendant is not challenging this particular document. (Tr. at 10, 9–23–97.) Agent Huff received a phone call from Defendant's attorney informing that Ada Meléndez wanted to talk to FBI Agents. (Tr. at 18.) FBI Agents made the arrangements and went to the detention center, MDC Guaynabo, P.R.,

to interview the Defendant. Agents Huff, Torres Diaz, and Yolanda Medina went to the prison. There they met with attorney Ramón Garcia who later conferred in a private room with Defendant Ada Meléndez. Following said conference, "he came out and talked to us to interview her." (Tr. at 20.) Defendant's attorney stated that Ada Meléndez said that although she was not obligated to speak to the agents, she wanted to speak to the agents. (Ex. 4.) The agents then went into the room "read her rights again, from the advice of rights form and we interviewed her...." (Tr. at 20.) The Defendant provided no evidence whatsoever on coercion, intimidation, and/or deception, nor of not receiving a proper reading of the document prior to signing this document also in block letters as Ada Meléndez. **The Court must inescapably conclude that all the Notice of Rights and waiver forms signed by Defendant were "voluntary," "the product of a free and deliberate choice."**

## II.

The "awareness of both the nature of the right being abandoned and the consequences...." *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141.

Defendant presented evidence through herself and two expert psychologist witnesses, Dr. Ruth Prevor and Dr. Judith Mercado, implicating that she lacked the cognitive ability to waive her *Miranda* rights knowingly and intelligently. The United States countered by presenting its own expert psychiatric witness, Dr. Haydee Costas Suárez, and the testimony of an agent Ivan Cruz involved in the facts of the case who had prior experience in his family with the handling of retarded persons.[2]

█ Courts have generally concluded that "no single factor, such as I.Q., is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving ... the constitutional rights embraced in the *Miranda* rubric." *Fairchild v. Lockhart.* 744 F.Supp. 1429, 1432 (E.D.Ark.

---

**2.** Since the burden was on the United States, Dr. Costas Suárez testified before Dr. Prevor and Dr. Mercado.

1989) (containing a compendium of cases discussing that defendant's limited cognitive abilities were a factor considered to determine the validity of the waiver). *See also Dunkins v. Thigpen,* 854 F.2d 394, 398–99 (11th Cir.1988), *cert. denied* 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *United States v. Young,* 529 F.2d 193 (4th Cir.1975).

A prior determination has been made in the case entered by Hon. Magistrate Judge Justo Arenas, (Docket No. 139), that codefendant Ada Meléndez Garcia is competent to stand trial pursuant to 18 U.S.C. § 4241 that was adopted by the Court in an Opinion and Order of June 12, 1996, (Docket No. 217).

The District Court determined that "Defendant ..., although mildly retarded, has both a rational and factual understanding of the proceedings against her and the ability to conduct with her attorney." The Court then concluded that: "[a]t the time of her arrest, Defendant was aware of both her right to remain silent ... and the search warrant requirement." (Docket No. 217 at 4–5.) Defendant has now requested that the Court revisit the determination but in a slightly different context. The court entertains the request.

This Court is at liberty to determine from the conflicting expert testimony which expert is to be ultimately credited. *United States v. Frank,* 956 F.2d 872 (9th Cir.1991); *United States v. McClure,* 786 F.2d 1286, 1290 (5th Cir.1986).

Dr. Haydee Costas interviewed the Defendant on two occasions to determine her competency to stand trial [3] and further interviewed her a third time to determine Defendant's awareness to waive her constitutional rights and to ascertain if Defendant understood the consequences. The expert further reviewed copies of medical records at Caguas Health Center and the Federal Detention Center [4] and interviewed the Head of the Health Center and security personnel of the prison. The opinion of Dr.

Costas is that Defendant although of social cultural limitations is a person with a low-normal to borderline intellectual level. The borderline intellectual level "is more her environment than her aptitude." (Tr. at 21, 9–23–97.)

Because the Court concludes that the original mental competency determination contains facts that are relevant and pertinent to the instant inquiry, the Court finds appropriate to review the testimony of Dr. Costas as to the traits of the Defendant, who originally testified at the competency hearing and reiterated her testimony at this hearing. Dr. Costas stated that Defendant "was able to understand what was happening to her." She described a "good relationship with her lawyer" which allowed her "to participate in her own defense and had a reasonable explanation for the happening." She recognized that "she was being accused of participating in this event in which a lady lost her life and she was going to be [tried] for that." The Defendant narrated to the expert the facts and explained "her limited participation with other persons." The Defendant further explained her participation "along with other persons who had been accused of the same charges and gave an explanation why she was innocent." Finally and most critical, Defendant explained to the satisfaction of the expert how she was "responsible for saving the child's life," the son of the victim. The Defendant further was able to explain how she had developed a correspondence with codefendant Suárez Lazú,[5] with the help of a neighbor Elizabeth Rivera who aided her in reading and writing the letters. The Defendant further stated that she never met the victim (*See generally* Tr. at 32–35.)

As to the facts that occurred the night of the search of her property and her arrest, the Defendant used phrases as a search "without permission," and "violation of rights" that occurred to her because a document was found in the garbage can located outside her property. The Defendant further stated that she was not properly in-

---

3. The original interviews were on July 26, 1995 and September 9, 1995.

4. The Detention Center is MDC Guaynabo, P.R.

5. Defendant originally met codefendant Suárez Lazú in a shopping center in Humacao. The correspondence was later developed while Suárez Lazú was detained in a local jail.

formed of charges against her as "required by law" and that she was "anxious" when originally questioned by agents. The Defendant further stated that she was not properly advised by the agents that anything she said could "incriminate me." Finally, the Defendant is quoted by Dr. Costas as saying that "maybe it was something I said that got me into this problem." (Tr. at 35–38.) (Ex. 6.)

Defendant further indicated that she would not plead guilty to the instant offense even if the lawyer asked her to do so. (Tr. at 39.) The Defendant recognized the role of the prosecutor and the Court and provided a reasonable explanation for her innocence. (Tr. at 40–41.) The Defendant also described to the psychiatrist that she was being harassed by penal guards but that she had controlled the situation. (Tr. at 38–39.)

The Government's expert in making her opinion in the instant case considered, in addition to prior described facts, the following: [6]

1. Defendant had been supporting her child and herself.

2. Defendant traveled regularly to government agencies for self-support.

3. Defendant performed domestic work for self-support.

4. Defendant lost her residence during Hurricane Hugo and was capable to ask and receive help from government agencies, culminating in "receiving a check" for the property.

5. Defendant is capable of surviving in local society with her son.

6. Defendant has the ability to conceal information: (Tr. at 47–48.)

   (a) concealed she had been seeing her son while in prison

   (b) concealed she was married

   (c) concealed she had a boyfriend

   (d) concealed she authorized the boy friend into her house.

7. Defendant had the ability to purposely state false facts, such as the death of the mother. (Tr. at 49.)

8. Defendant is capable of making spontaneous ironic statements, (Tr. at 66–67)(statement made in Court referring to herself ironically as "really dangerous").

9. Defendant is a person who although having no formal education is extremely street wise, in Puerto Rico known as "jaiba."

10. Defendant has an I.Q. functional level of 77. Said level is considered low level to borderline intellectual level. (Tr. at 51.) (Dr. Costas further stated that two psychiatric studies indicated that persons at level 77 are competent to waive constitutional rights. (Tr. at 67.)) [7]

Considering all the above "total circumstances," Dr. Costas opined that codefendant Ada Meléndez operated at a low-normal to borderline intellectual level more a product of her environment than her aptitude level. Ada Meléndez was cognizant of her right and knowingly waived them and further recognized the consequences. (Tr. at 52, 65–66.) "I personally believe that she knew what was happening at that time. And she elected to give a confession or to provide information because she thought at that moment that was the best way to handle the situation." (Tr. at 66.)

The United States produced FBI agent Iván López to provide a layman opinion under Federal Rule of Evidence 701. Mr. Iván López has reared a child that is mentally retarded. The Court's original inclination was to deny the request, but reconsidered

---

**6.** The Court at the Opinion and Order as to mental competency found that defendant was capable of successfully suing the father of her children for alimony paternity. (Docket No. 217, at.3–4.)

**7.** Although the Court recognizes that no one factor is determinative, an I.Q. of 68 in a "street wise" defendant defeated allegations of mental retardation. *Correll v. Thompson,* 63 F.3d 1279 (4th Cir.1995), *see also Moore v. Dugger,* 856 F.2d 129 (11th Cir.1988) (I.Q. of 62 was determined and the person functioned as an 11 year old, confession found to be voluntary); *Fairchild v. Lockhart,* 744 F.Supp. 1429 (E.D.Ark.1989) (voluntary confession determined notwithstanding an I.Q. between 75 and 87). In these cases the "totality of circumstances" was examined, including the I.Q. level.

following the cases of *John Hancock Mutual Life Ins. Co. v. Dutton,* 585 F.2d 1289 (5th Cir.1978) and *Jones v. Dugger,* 839 F.2d 1441 (11th Cir.1988). The issue is one of the weight that the Court is to provide the testimony rather than one of admissibility. Mr. Lopez testified that in observing the demeanor of the Defendant on June 26, 1995, she did not seem mentally retarded. Her explanations "appeared to be logical;" "I hardly had to repeat myself" in questions addressed to her. (Tr. p. 20.) On this afternoon the Defendant directed law enforcement agents to places where she thought the victim was located. The Court accepts said evidence as part of the "the totality of circumstances."

Dr. Ruth C. Prevor and Dr. Judith Mercado Colón testified on behalf of the Defendant. The Defendant also took the stand. Although diametrically opposed to the opinion of Dr. H. Costas, Dr. Prevor's opinion and Dr. Mercado's opinion coincide. Dr. Prevor had prior to the instant hearing provided an opinion as to the mental competency of Defendant, testifying at the mental competency hearing before the Magistrate Judge. The opinion of Dr. Prevor was mainly based on a series of tests given to the Defendant geared to determine mental competency.[8] Dr. Prevor also interviewed the Defendant and found that at times she spoke very simple language but she spoke intelligently, other times very childish. The Defendant had a limited capacity for attention and the comprehension of questions was only partial. (Tr. at 120.) Dr. Prevor's opinion was that the Defendant has a severe cognitive limitation; that the Defendant's level of comprehension, level of abstraction, and memory functions are below standard; that the Defendant cannot understand abstract terms and cannot understand the meaning of rights

nor foresee the consequences of actions; and that the Defendant, therefore, cannot comprehend her rights nor could have made a free and deliberate choice.

On cross examination Dr. Prevor admitted that she obtained the consent of the Defendant and that the Defendant understood the purpose of the evaluation. The Defendant, hence, recognized the objective of the evaluations and tests performed raising the specter of manipulation by the Defendant of said test as noted by Dr. Costas at rebuttal testimony. Although Dr. Prevor stated that Defendant did not know how to use numbers, the testimony of the Defendant in Court contradicted the conclusion. The Defendant stated that she knew the age of her daughter (nine years old), described the number of agents that originally searched her house (three), stated the number of agents surrounding her house after arrest (an "average" of nine), stated the number of female police officers (two), and provided the number of hours she was at a party the day of the arrest (three to four). Dr. Prevor further admitted that Defendant had the ability to knowingly provide evasive and misleading answers (intimate relationships).

Dr. Judith Mercado subjected the Defendant to a series of tests after Defendant was found mentally competent.[9] Dr. Mercado opined similarly to Dr. Prevor that Defendant cannot understand abstract concepts nor can she comprehend elemental notions as specific days of the week and specific dates of the month. Curiously, although the Wechsler test placed the Defendant at an overall "borderline level," (Tr. at 17, 9–24–97), Dr. Mercado concluded that Defendant "functions at an intellectual level of mental retardation." (Tr. at 17, 9–24–97.) The final critical opinion of Dr. Mercado was the following:

---

8. Draw a Person test, Raven test, Bender visual motor test, Wechsler Intelligence Scale test; Vineland adaptable behavior Instrument (not a test, an instrument); Wechsler Intelligence Scale for children test, Laterality test. (Some tests revealed borderline and/or below average or low intellectual comprehension, others revealed mild retardation and still others revealed the conduct of a 16 year old child and still others of a 4 year old child. The Wechsler Intelligence Scale test determined an I.Q. of 77 (7% percentile of Puerto Ricans of her age)).

9. Defendant was subjected to the Wechsler Intelligence Scale test, the Bender Visual Motor Gestalt test, the Draw a Person Projection test, the Thematic apperception test; Rorschach test (psychodiagnostic). The Wechsler tests revealed that Defendant had a borderline intellectual level; had a borderline intellectual reasoning capacity; her concentration and retention level was borderline; the verbal capacity was dull normal; motor skills were average and the perceptual ability was borderline.

Ada Meléndez intellectual performance is the performance of a mentally retarded person, with noticeable limitations in the cognitive area, limitations in the area of memory, limitations in the area of orientation, limitations in the capacity of comprehensive language, limitation in the abstract capacity, limitation to process and analyze; to evaluate alternatives, to make decisions, to anticipate the consequences of her actions, which is what is known as poor social justice. With academic and social very noticeable deprivation. With an emotional state when I evaluated her for this case of marked depression, with a history of multiple suicidal attempts. And above all, in my conclusion I say [sic] why she is mentally retarded person. She has noticeable limitations in her adaptive functions. (Tr. at 18)

On cross examination, Dr. Mercado accepted that the Defendant consented to the evaluations and was explained the purpose, "at the end she understood." (Tr. at 20.) The specter of test manipulation by the Defendant was again confirmed. Further, the expert was confronted with the fact that although the Defendant insisted that she cannot write her name, a conclusion adopted by Dr. Mercado, as early as June 26, 1995 (the date after she was arrested), she signed her name in block letters. (Ex. A; Ex. 5; Ex. 10.) Further, Defendant testified at the hearing of September 23, 1997 that she could not write her name. (Tr. at 20–21, 9–23–97.) Dr. Mercado also opined that Defendant did not know numbers, yet as was described before, this defendant used numbers when she took the stand, (see discussion *infra* at 12–13), including the fact that she remembered that on June 25, 1995 she was at a party prior to the search of her house being conducted, for a period of "three or four hours." (Tr. at 88, 9–23–97).[10] Dr. Mercado further claimed that Defendant could not handle simple concepts such as days of the week or dates in the month. Notwithstanding, Defendant when evaluated by Dr. Costas in 1995 stated that it was a shame that she was arrested on June 25, 1995 when she

was about to be gainfully employed on July 3, 1995. (Tr. at 44, 9–23–97.)

Dr. Mercado placed significant weight in the fact that Defendant could not understand abstract concepts and, therefore, could not understand her constitutional rights, an abstract term. The expert opinion on this matter is not well founded because the Defendant used the concept of "average" when stating that an average of nine people where at her house the night of June 25, 1995. The Defendant also answered questions to counsel understanding the abstract term of "intimidation" and the term of "depression." "Did you feel intimidated by them? (Ans.) Yes." "Did you feel depressed sometime ago? (Ans.) Yes." (Tr. at 79, 85.) Defendant further claimed having saved the life of the child of the victim which entails some comprehension of abstract concepts. Moreover, Defendant Ada Meléndez showed capacity in handling abstract concepts when she stated that she needed psychological treatment "because her mother didn't treat her adequately nor offered her the love she needed." (Ex. E at. 4, Report of Dr. Mercado.)

The Court notes that Defendant scored in 1997 more poorly in psychological tests conducted by Dr. Mercado, than the exact tests that she was subjected to by Dr. Prevor in 1995–1996. The Court concludes that Defendant knowing the purposes of the tests engaged in manipulation as opined by Dr. Costas. (Tr. at 38–44, 9–24–97.)

Considering the "totality of circumstances and the facts surrounding the particular case, 'including the background experience and conduct of the accused,'" *United States v. Garcia*, 983 F.2d at 1169, the Court considers the opinion of psychiatrist Dr. Haydee Costas Suárez to be more reliable than the opinion of the other experts that testified in the case. For this conclusion, the Court relies mainly on the statements of the Defendant when she took the stand and the statements made by the Defendant to Dr. Costas on July and September 1995. The Court adopts the opinion of Dr. Haydee Costas Suárez that the

---

**10.** This statement by Defendant clearly demonstrates that her memory and retention ability is not that of a retarded person.

Defendant Ada Meléndez was fully aware of the nature of the right being abandoned and the consequences thereof.

### III.

### CONCLUSION

**The Motion to Suppress of codefendant Ada Meléndez pursuant to a preponderance of evidence standard is DENIED.**

IT IS SO ORDERED.